*Jocelyn P. v. Joshua P.*
No. 2125, Sept. Term, 2019
Opinion by Leahy, J.

**Family Law > Dissolution of Marriage or Partnership > Interests in Pre-embryos**
Jocelyn and Joshua's "competing interests in the disputed pre-embryo[] derive from constitutional rights in the realm of reproductive choice." *In re Marriage of Rooks*, 429 P.3d 579, 586 (Colo. 2018). At its core, reproductive autonomy "is composed of two rights of equal significance—the right to procreate and the right to avoid procreation." *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992).

**Reproductive Autonomy > Pre-embryos > Legal Status**
In light of the unique, countervailing interests inherent in cryogenically preserved pre-embryos, we conclude that the frozen pre-embryo cannot be classified simply as an interest in property because it concerns interests of far broader dimension.

**Reproductive Autonomy > Pre-embryos > Legal Status**
We agree with those courts that recognize the special respect due cryopreserved pre-embryos in light of their potential for human life as well as the fundamental and coextensive rights of their progenitors to decide "whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972).

**Family Law > Dissolution of Marriage or Partnership > Interests in Pre-embryos > Blended Contractual/Balancing of Interests Approach**

We hold that disputes that arise during dissolution of the parties' marriage or partnership involving the custody of cryogenically preserved pre-embryos should be resolved utilizing a blended contractual/balancing-of-interests approach, first enunciated in *Davis v. Davis*, 842 S.W.2d 588 (1992), further refined through the non-exhaustive and inappropriate factors delineated in *In re Marriage of Rooks*, 429 P.3d 579 (2018) and the special considerations concerning third-party form contracts identified in this opinion.

**Family Law > Dissolution of Marriage or Partnership > Interests in Pre-embryos > Framework for Dispute Resolution > Contractual Analysis > Form Contracts**

Given the pervasiveness of third-party informed consent agreements, we emphasize that the progenitors—not fertility centers—must expressly and affirmatively designate their own intent. *See Szafranski v. Dunston (Szafranski II)*, 34 N.E.3d 1132, 1157 (Ill. App. Ct. 2015) (analyzing cases where "courts have found a couple's dispositional intent to have been expressed in an IVF-related agreement"). Boilerplate language in a third-party form contract may not qualify as an express agreement between progenitors regarding who should have custody of their jointly created embryo in the event of the dissolution of their relationship.

Circuit Court for Baltimore County
Case No. 03-C-17-007803

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2125

September Term, 2019

_____

JOCELYN  P.

v.

JOSHUA P.

_____

Kehoe,
Arthur,
Leahy,

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  April 29, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

For nearly half a century,[1] *in vitro* fertilization ("IVF") has offered couples who are unable to conceive naturally the ability to have biological children. Still, the law governing frozen pre-embryos created through this process remains unsettled.[2] As a matter of first impression in Maryland, we examine how to determine the rights of parties, upon dissolution of their marriage or partnership, in a pre-embryo that they jointly created and cryopreserved.

Jocelyn P. and Joshua P. signed and initialed a form "Agreement and Informed Consent for In Vitro Fertilization, Intracytoplasmic Sperm Injection, Assisted Hatching and Embryo Freezing" ("IVF Contract") with the Fertility Center of Maryland ("FCM") after Jocelyn was diagnosed with primary infertility and the couple was unable to have children through other means. Through the IVF process, Joshua and Jocelyn produced three pre-embryos. The first pre-embryo was lost due to miscarriage; the second was successfully implanted, resulting in the birth of a child in 2016; and the third and final pre-embryo was kept frozen at FCM.

---

[1] On July 25, 1978, the first child conceived through IVF, Louise Joy Brown, was born in Manchester, England to Lesley and John Brown. *See generally* Lesley Brown & John Brown, Our Miracle Called Louise: A Parent's Story (1979).

[2] Carissa Pryor, *What to Expect When Contracting for Embryos*, 62 Ariz. L. Rev. 1095, 1096-97 (2020) ("Although case law and legislation have become relatively settled when it comes to grappling with other reproductive aids such as sperm and egg donation, adoption, and surrogacy, they are only just beginning to develop when it comes to embryo disputes with many, if not most, jurisdictions lacking legislation or binding jurisprudence.").

After the parties separated, they sought dissolution of the marriage and reached a settlement on all matters, including custody of their child and property disposition, with one exception. They could not agree on what to do with the remaining cryopreserved pre-embryo. Jocelyn wanted the pre-embryo for implantation, whereas Joshua wanted the pre-embryo either destroyed or donated. After an evidentiary hearing and oral argument, on November 20, 2019, the Circuit Court for Baltimore County ordered that the pre-embryo be jointly awarded to the parties "such that no transfer, release, or use of the frozen embryo[3] shall occur without the signed authorization of both parties."

Jocelyn appealed and presents four questions for our review, which we have consolidated and recast as follows:

1. Should the circuit court apply a balancing-of-interests approach, adopted by a majority of states, in the absence of an express agreement between the progenitors about what to do with their jointly created frozen pre-embryos?

---

[3] The term "embryo" is used interchangeably by courts and legal writers with multiple other terms, including "pre-embryo," "pre-zygote," and "zygote." *See* Laura S. Langley, J.D. & Joseph W. Blackston, M.D., J.D., *Sperm, Egg, and A Petri Dish Unveiling the Underlying Property Issues Surrounding Cryopreserved Embryos*, 27 J. Legal Med. 167, 170 (2006). The term "embryo" was used in the IVF Contract and employed by the trial court and the parties throughout the underlying proceedings. We note, however, that it is more accurate to refer to the frozen embryo in this case as a "pre-embryo" because the term refers to "that period of development from the end of the process of fertilization until the appearance of a single primitive streak," the precursor of the nervous system. Howard W. Jones, Jr. & Charlotte Schrader, *And Just What Is a Pre-Embryo?*, 52 Fertility & Sterility 189, 190 (1989); *see also In re Marriage of Rooks*, 429 P.3d 579, 582 (Colo. 2018) ("'Pre-embryo' is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. . . . An embryo proper develops only after implantation." (citation omitted)). Barring direct quotation, we will use the term "pre-embryo."

2. Did the circuit court err in determining that the IVF Contract was unambiguous and controlled the disposition of the remaining frozen pre-embryo?

3. Did the circuit court abuse its discretion under its alternative determination under the balancing-of-interests test that Joshua's interest to avoid procreation outweighed Jocelyn's interest in procreation by implanting the remaining frozen pre-embryo?

We agree with those courts that recognize the special respect due cryopreserved pre-embryos in light of their potential for human life as well as the fundamental and coextensive rights of their progenitors to decide "whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. 438, 453 (1972). Consistent with the approaches adopted by other states that have addressed the issue, we hold that if, upon dissolution of their marriage or partnership, the parties cannot reach agreement about what to do with any remaining pre-embryos that were cryopreserved during their relationship, our courts should first "look[] to the preference of the progenitors" in any prior agreement expressing their intent. *Davis v. Davis*, 842 S.W.2d 588, 642 (Tenn. 1992).

In the absence of an express agreement, courts should seek to balance the competing interests under the following factors: (1) the intended use of the frozen pre-embryos by the party seeking to preserve them; (2) the reasonable ability of a party seeking implantation to have children through other means; (3) the parties' original reasons for undergoing IVF, which may favor preservation over disposition; (4) the potential burden on the party seeking to avoid becoming a genetic parent; (5) either party's bad faith and attempt to use the frozen pre-embryo as leverage in the divorce proceeding; and (6) other considerations relevant to the parties' unique situation. *In re Marriage of Rooks*, 429 P.3d 579, 593-94

3

(Colo. 2018). We further agree with our sister states that hold it is impermissible for a court to consider financial and economic distinctions between the parties; the number of existing children; or "reasonable alternatives," such as adoption, available to the party seeking to become a genetic parent. *Id.*

When analyzing a prior agreement, courts should take particular care to ensure that it manifests the progenitors' actual preferences. Given the pervasiveness of third-party informed consent agreements, we emphasize that the progenitors—not fertility centers—must expressly and affirmatively designate their own intent. While we do not condemn all form contracts to inconsequence in this context, boilerplate language in third-party form contracts that lack expression or direction from the progenitors will not qualify as an express agreement for this purpose. The court should incorporate such form contracts within the balancing factors set out above, to be considered alongside other evidence. We conclude that such a blended contractual/balancing-of-interests approach is consistent with Maryland law.

For the reasons expressed in this opinion, we reject the mutual contemporaneous consent approach employed by a minority of states, and upon which the circuit court based its decision in this case. We further hold that the circuit court erred in its determination that the IVF Contract evinces Jocelyn and Joshua's preference regarding what to do with their cryopreserved pre-embryo in the event of their divorce. Accordingly, we vacate the judgment of the circuit court and remand for further proceedings. We instruct the court to consider whether, based on the testimony presented, Jocelyn and Joshua had an express oral agreement that they would "give the embryo the opportunity for life" and whether that

4

agreement was intended to survive the dissolution of their marriage. If the court determines that there was no oral or written agreement that expressly delineated the parties' intentions, then the court must balance the parties' interests under the framework set out above and further described in this opinion.

## BACKGROUND

The parties were in their twenties when they married in July 2010. Jocelyn was a board-certified nurse, and Joshua was a paramedic. During the first two years of their marriage, they attempted to conceive a child naturally, without success. In August of 2012, they consulted with Shady Grove Fertility Reproductive Science Center ("Shady Grove"), and after extensive infertility testing, Jocelyn was diagnosed with (1) "[p]rimary infertility" and (2) "[p]ossible unexplained infertility."

Jocelyn and Joshua decided to pursue intrauterine insemination ("IUI") at Shady Grove in the fall of 2013.[4] Jocelyn had three IUI procedures on September 30, 2013, November 23, 2013, and December 24, 2013. The IUI procedures were accompanied by numerous doctor visits, blood draws and tests, ultrasounds, and shots of hormones to increase egg production and prompt ovulation. The three IUI procedures were unsuccessful.

After another year of unsuccessful attempts to conceive without assistance, on January 21, 2015, Jocelyn and Joshua consulted the Fertility Center of Maryland ("FCM")

---

[4] IUI is a fertility treatment that involves the "placement of sperm that have been washed of seminal fluid directly into the uterus to bypass the cervix." *Stedman's Medical Dictionary Online*, intrauterine insemination (2021).

to explore additional options to conceive a child. After further examination, FCM diagnosed Jocelyn with "[p]rimary infertility." She underwent a hysteroscopy, dilation, and curettage procedure to increase her chance of pregnancy. Jocelyn then underwent four additional IUI procedures between April and June, 2015. Unfortunately, these procedures also were unsuccessful. After the last unsuccessful IUI, with consultation of FCM, Jocelyn and Joshua elected to attempt to conceive through IVF.[5]

**The IVF Contract**

The parties executed the IVF Contract on September 10, 2015. The IVF Contract stated that the "main goal of IVF is to allow a patient the opportunity to become pregnant using her own eggs and sperm from her partner or from a donor." It described the "IVF process from start to finish,"[6] including "the risks that th[e] treatment might pose to you and your offspring." For example, risks associated with the initial removal of the eggs from the ovary include "infection" and "bleeding," which, if "major" will "frequently require surgical repair and possibly loss of the ovary." The IVF Contract also warned that

---

[5] IVF is "a process whereby (usually multiple) ova are placed in a medium to which sperm are added for fertilization, the zygote thus produced then being introduced into the uterus with the objective of full-term development." *Stedman's Medical Dictionary Online,* in vitro fertilization (2021).

[6] The components covered in the IVF Contract included the "Technique of IVF":

a. Core elements and their risk;
b. Transvaginal Oocyte Retrieval;
c. In Vitro Fertilization and Embryo Culture;
d. Embryo Transfer; and
e. Hormonal Support of Uterine Lining.

6

"it is possible to damage other intra-abdominal organs during the egg retrieval. Previous reports in the medical literature have noted damage to the bowel, appendix, bladder, ureters, and ovary."

Despite the multiple medications involved in the treatment, the IVF Contract warned that the egg-retrieval process may be unsuccessful:

> Even with pre-treatment attempts to assess response, and even more so with abnormal pre-treatment evaluations of ovarian reserve, the stimulation may result in very few follicles developing. The end result may be few or no eggs obtained at egg retrieval, switching to intrauterine inseminations or even cancellation of the treatment cycle prior to egg retrieval.

Section A.2.c. of the IVF Contract addressed cryopreservation. The subsection, offset in capital letters and titled "OWNERSHIP AND DISPOSITION OF FROZEN EMBRYOS," stated, in pertinent part:

> It is the policy of FCM that embryos produced by the joining of eggs and sperm are subject to disposition in a manner ***mutually agreed upon by the partners.*** Where donor eggs or sperm are being used, the embryos are subject to disposition in a manner mutually agreed upon by the couple receiving IVF services at the site, **except in the cases of divorce.** In the event of a divorce if one of the partners produced the gametes (sperm or eggs) then the producer shall have the sole decision-making authority over the disposition of the embryos.
>
> * * * * *
>
> I/we (The Couple) understand and agree that <u>if any dispute arises between the two of us regarding disposition of the embryos, FCM is authorized, in its sole discretion, to refrain from taking any action unless and until otherwise directed by a final judgment of a court of competent jurisdiction or by another agreement signed by both partners.</u> We agree to be jointly and individually responsible for the storage fees. FCM is entitled to rely on future written agreements provided by us, and shall have no obligation to inquire as to their validity or enforceability.
>
> I/we understand and agree the FCM, in its sole discretion, may institute legal proceedings of any kind regarding the disposition of the

7

embryos.  If and in that event, this [IVF Contract] shall be governed by the laws of the State of Maryland.

(Bold and italic emphasis in original; underscore emphasis added).  The parties were allowed to elect one of two alternatives "[i]n the event of death or mental incapacity of <u>one of us</u>."  Jocelyn and Joshua both entered their initials indicating their desire that the frozen pre-embryo would "[b]ecome the property of the (other) surviving partner who will have full authority regarding disposition which may include storage, disposal or use to establish a pregnancy."

Finally, the IVF Contract specified the storage period for pre-embryos:

In the event that embryo(s) have been in storage for five (5) years, it is the policy of FCM that the disposition of the frozen embryos should occur at that time.  While the couple may elect to undertake disposition of the embryo(s) prior to that time (which may include transferring them to the uterus of the female to attempt pregnancy, transfer to another facility, disposal or donation to another couple).  The Couple agrees to make a determination before the expiration of the five (5) years of storage plan.

The Couple understands that FCM will provide them with a thirty (30) days advance notice that the five (5) years has elapsed[.]  **If I/we do not respond or cannot be contacted, FCM is hereby authorized to discard any remaining frozen embryos according to laboratory procedure.**

(Emphasis in original).

Jocelyn underwent an oocyte retrieval to remove eggs from her ovaries on September 16, 2015.  Fourteen oocytes were retrieved.  Of these fourteen, eight were fertilized, and three developed into pre-embryos.

The first pre-embryo implanted in Jocelyn resulted in a miscarriage in October 2015. The second pre-embryo was successfully implanted in January of 2016, and the parties' only child was born in September of 2016.  The third pre-embryo—the subject of this

8

appeal—was kept frozen at FCM until it was transferred to Virginia on June 1, 2020, as explained further below, under an "Agreement for Receipt, Storage and Disposition of Frozen Embryos," ("Storage Agreement") between Jocelyn, Joshua and Fairfax Cryobank, Inc. ("Cryobank").

### Deterioration of the Parties' Relationship and Divorce Proceedings

Joshua and Jocelyn began to experience marital difficulties that culminated in an argument in July 2017 that required intervention by the police. Jocelyn left the marital home and, a week later, sought and obtained a protective order against Joshua in the District Court of Baltimore County. The protective order was later reversed following a de novo proceeding in the circuit court.

On August 10, 2017, Jocelyn filed a complaint for limited divorce, custody, and other relief. Joshua filed an answer and counter-complaint for limited divorce, custody, and other relief on September 6, 2017. Both parties subsequently filed amended complaints seeking an absolute divorce and requesting the court determine the issue of marital property.

On May 29, 2019, Joshua, Jocelyn, and their respective counsel appeared in court and entered a settlement into the record. The parties had reached a settlement on all issues, except what to do with the third pre-embryo that was cryopreserved. Jocelyn and Joshua agreed to submit the issue to the circuit court.

### *Pre-Trial Memoranda*

On July 24, 2019, Jocelyn filed a trial memorandum and notice of intent to rely on foreign law concerning the disposition of the remaining cryopreserved pre-embryo. She

9

submitted that the circuit court "must balance the interests of the parties and ultimately grant [Jocelyn] the sole use of the remaining embryo." Because the "ownership of frozen embryos is a matter of first impression in Maryland," Jocelyn averred that the court "must look to the law of other jurisdictions for guidance." She identified the three approaches utilized by courts in divorce cases to resolve disputes over frozen pre-embryos: (1) contractual; (2) balancing-of-interests; and (3) contemporaneous mutual consent.

Pursuant to the contract/balancing approach, Jocelyn summarized that "courts will first look to the parties' contract, if any[,]" and then, if the contract does not resolve the dispute, "balance the interests of each party to determine a fair and equitable disposition." First, she asserted that the IVF Contract "does not fully resolve the dispute because it does not contemplate disposition of the fertilized embryo in the event of divorce, except in the case of donor sperm or eggs, not applicable here."[7] Consequently, Jocelyn asserted that the court should "balance the interests of each party to determine a fair and equitable disposition." Relying on *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992); *Reber v. Reiss*, 42 A.3d 1131 (Pa. Sup. Ct. 2012); and *In re Marriage of Rooks*, 429 P.3d 579 (Colo. 2018), among other cases, she averred that her interest in procreation outweighed Joshua's interest against procreation because "the remaining embryo is reasonably believed to be [her] last opportunity to bear a child." Specifically, Jocelyn asserted that she

> devoted and invested two years of her life enduring the painful and invasive IUI and IVF procedures to ensure that she could achieve pregnancy with the result that she was only able to achieve a total of three viable embryos. The

---

[7] The IVF Contract provides: "In the event of a divorce if one of the partners produced the gametes (sperm or eggs) then the producer shall have the sole decision-making authority over the disposition of the embryos."

10

likelihood that [Jocelyn], who is almost 39 and assessed to be infertile, could reasonably be expected to achieve pregnancy by some other means if the current embryo is destroyed, is not reasonable.

Accordingly, Jocelyn argued that application of the balancing test would result in transfer of the frozen pre-embryo to her.

Jocelyn contended that the mutual consent approach, adopted by the Supreme Court of Iowa in *In re Marriage of Witten*, 672 N.W.2d 768 (Iowa 2003), "is inconsistent with Maryland law." Under this approach, pre-embryos are "stored until the parties reach an agreement, with the party opposing destruction to be responsible for paying storage fees." Jocelyn argued that this approach "essentially creates a right of rescission after a contract has been made. Such approach is diametrically opposed to Maryland's black-letter law on rescission, namely, that a party to a contract cannot back out of a 'bad deal' based on changed conditions[.]"

In Joshua's hearing memorandum, he stated that he sought "ownership of the frozen embryo in order to have it destroyed." He then reviewed the three approaches performed by various courts. First, Joshua averred that "in this case, the contractual approach is not entirely helpful because the contract entered into by the parties with [FCM] specifically states that they are to reach a mutual agreement as to the disposition of the remaining embryo."

Second, Joshua agreed that "in cases where parties may not have a clear and/or enforceable agreement regarding disposition of embryos, then the [c]ourt may balance one party's right to procreate versus the objecting party's right not to procreate." Relying on *Davis v. Davis*, 842 S.W.2d 588, 603 (Tenn. 1992), he asserted that "[o]rdinarily, the party

11

wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the pre-embryos in question." Joshua contended that, because Jocelyn already "attained parenthood," this approach weighed in his favor.

Third, Joshua reviewed the contemporaneous mutual consent approach established in *A.Z. v. B.Z.*, 725 N.E.2d 1051 (Mass. 2000) and *In re Marriage of Witten*, 672 N.W.2d 768 (Iowa 2003). He asserted that, under this approach, courts view "decisions about the disposition of frozen embryos belong[ing] to the couple that created the embryo with each partner entitled to an equal say in how the embryos should be disposed." *Witten*, 672 N.W.2d at 777.

### *Evidentiary Hearing*

The court held an evidentiary hearing to address the parties' dispute over the remaining cryopreserved pre-embryo on July 29, 2019. Jocelyn's counsel offered a brief summation of the procedures undertaken by the parties at FCM and Shady Grove, and the significant time commitment required from Jocelyn to undertake IVF. Counsel for Joshua stipulated to this factual background.

Jocelyn testified that after two years without success conceiving naturally, she underwent three IUI procedures at Shady Grove. These IUI procedures caused "internal gut wrenching pain. Just like – like you got kicked in the gut really hard but from the inside" and "the hormones were just awful to go through." She related that the failure to conceive was "absolutely devastating." After these three procedures, she "decided to take a break[.]"

12

Based on her diagnosis at FCM and Shady Grove, Jocelyn understood that she would be unable to conceive a child without assisted reproduction. So, in 2015, Jocelyn underwent four additional IUI procedures with FCM. For each IUI procedure, she expended considerable time at FCM, sometimes visiting the "doctor's office three times a day." After seven unsuccessful IUI procedures, Joshua and Jocelyn considered IVF.

Jocelyn explained that she was "hesitant to go through with the IVF" because she "was raised in a very religious family" and "believe[d] life begins at conception." Specifically, she explained that she:

> just wanted to be absolutely sure that [FCM] let every single one of th[e] embryos grow and, you know, reproduce cells until they no longer did and then they were to discard them. [FCM's head embryologist] assured [Jocelyn] that is exactly how it happens. They don't pick and choose, say, hey, this one is good, this one is not, let's trash it. Because I think that it is God's decision whether the embryos survive or not. It shouldn't be somebody else's decision.
> So I finally decided okay, I'm emotionally and religiously, spiritually prepared to go through with the IVF.

The parties then had a meeting on September 10, 2015, at FCM for "probably . . . over an hour going through the whole [IVF Contract], risks, procedures" and initialed each page of the IVF Contract and signed it.

About a week later, Jocelyn was put under anesthesia and underwent an oocyte retrieval—14 eggs were removed. Eight eggs became fertilized, and three developed into pre-embryos. The first pre-embryo was implanted a few days later. At a checkup a week or two later, Jocelyn found out that she was pregnant. Unfortunately, she miscarried in

October of 2015.[8]

In response to a question from counsel concerning whether the parties would "try again after the miscarriage[,]" Jocelyn testified that the parties had discussed "at length beforehand . . . before we went through this procedure, that we agreed that every single embryo would be used because we create a life and it was our responsibility to give that embryo the opportunity of life." The parties then implanted the second pre-embryo, which resulted in the birth of their only child.

In describing the fertility process, Jocelyn said it was "awful." Her "hair fell out" and became "extremely thin." She gained thirty pounds and "had awful gout pain in [her] toe." She had "hundreds" of appointments. According to Jocelyn, the sheer number of appointments required her to work part-time "because there was no way that [she] could have worked full-time. . . . [She] couldn't keep [her] job."

Jocelyn requested that the court grant the pre-embryo to her because "[t]o [her]. . . [t]here is no difference with that child being in a lab and being five days old and being in [her] body and being five days out." While Jocelyn acknowledged that she could "potentially" go through IVF again, she clarified:

> [F]rom a religious standpoint[,] I don't want to go through IVF again. I would then be creating more life with potentially not enough time to use the embryos that I created because I'm just older. So there is no guarantee that it would work again. And I don't want to go through that again. It was awful.

---

[8] After Jocelyn recounted these facts, the court inquired whether the eggs that had not been fertilized could have been frozen. Jocelyn explained that she was not given that option.

14

After Jocelyn rested her case, she was called as the first witness in Joshua's case-in-chief. Joshua's counsel inquired whether Jocelyn sought to have the pre-embryo turned over to her after entry of the protective order. She replied: "I wanted to protect my child in any way that I could. So that was definitely an issue discussed as one of the primary issues[.]" After counsel sought to elicit how much time passed between the denial of the protective order and the settlement agreement, Jocelyn said that she did not remember but that it was a "couple weeks" or a "couple months."

Joshua testified next. He explained that he was supportive of Jocelyn during IVF and attended "[n]early all" her appointments and jointly made the decision with her to begin IVF treatments. According to Joshua, before entering into IVF, the parties did not discuss the impact of a potential divorce. Joshua testified that he understood that neither he nor Jocelyn "are infertile by definition."

Joshua then addressed the protective order entered in the district court and visitation with their only child after the parties' separation. He testified that, after the district court initially entered the protective order, his visitation with their only child was "extremely thin" and "always . . . supervised." After a "significant amount of time," Jocelyn agreed to additional supervised visitation, and, ultimately, the parties agreed to a shared custody schedule. Joshua then described his concerns about having another child with Jocelyn:

> My concerns would be, first off, would be her health, the potential fetus's health given age, as she testified to. And also financial responsibility and access of being a parent. It is proven that it is half hers and half mine. I think given our current situation with access and parenting rights on my part, I believe it would just be a repeat offense, that I would be withheld time from that potential child.

15

On cross-examination, Joshua conceded that, while he and Jocelyn may "have had [their] disagreements," he agreed to share custody of their child with her. The judge then asked Joshua to specify his desire as to "what would happen to the embryo." Joshua responded that he wanted Jocelyn "not [to] have access. I do not in [any] way, shape or form wish to have another child with her given the current circumstance with divorce." Instead, he asked "that it either be destroyed or potentially donated for use by a needy family with both of us giving away our parental rights to it." Joshua further clarified that donation would be

> to satisfy our religious take on this situation that life is obviously very valuable. However, if it comes down to the [c]ourt making the decision for seeing us to donate it or destroy it, as long as she doesn't have use and we don't have responsibility, I think that is the most appropriate thing.
> * * *
> [I]f it comes down to use or destruction, I choose destruction.

The court further clarified that, even if Joshua's "parental rights and parental responsibilities somehow could be eliminated," Joshua would still not want Jocelyn to have the frozen pre-embryo.

Jocelyn was then called for rebuttal. She testified that the parties had discussed what would happen with the pre-embryo on prior occasions after their separation, and Joshua consistently indicated that he preferred donation. The court then asked Jocelyn to specify her intended use for the frozen pre-embryo. She replied:

> I would like to have another child. That is my baby. The fertility process was absolutely horrible. I gave up my career. I gave up my time. I gave up my health. And it is the same thing. . . . The one thing that I wanted since I was a little kid was to be a Mom. And to be told that I couldn't be and that I had to go through this process. And I did. And I worked so hard

16

at it. I went to every single appointment. He didn't go to all of the appointments. There were times I was there three times a day and I would go home and take him the cup, so he would give a sample and come back.

I sacrificed so much of my life and my time for this child. And I have a beautiful child who is amazing. But my intent, and I promised myself before I started the IVF process, was to give every single child that I created a chance at life. Because if I'm going to create life, it is my responsibility to take care of it. And I want to have that other baby. I don't have any issues supporting myself.

In response to another question from the judge, she testified that, to her knowledge, she was still able to produce eggs and had not been told otherwise by a medical expert. The court then heard closing argument from counsel and took the matter under advisement.

### *Memorandum Opinion and Order*

On November 20, 2019, the circuit court entered a memorandum opinion and order. After briefly summarizing the facts, the circuit court noted that while "Maryland lacks prior authority regarding the disposition of frozen embryos[,]" "[t]hree leading approaches have evolved to resolve these disputes: (1) the contractual approach, (2) the contemporaneous mutual consent approach, and (3) the balancing test." The court analyzed the case under each approach.

Under the contractual approach, relying on *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992), the court noted that "a contract regarding the disposition of embryos created through IVF is presumed valid and enforceable." The court determined that the IVF Contract "was unambiguously a 'binding contract' which 'controls the . . . disposition of embryos which are frozen during an IVF cycle at FCM.'" Specifically, the court found the following provision dispositive: "It is the policy of FCM that embryos produced by the joining of eggs and sperms are subject to disposition in a manner mutually agreed upon by the

17

partners." While other provisions concerned divorce when only one party donated gametes, the court determined that "divorce has no impact when both parties are gamete providers[.]" Accordingly, the court determined "if a court of competent jurisdiction adopts the contractual approach, this unambiguous contract is enforceable, and the disposition of the embryo requires mutual consent of the parties."

Turning to the contemporaneous mutual consent approach, and relying on *In re Marriage of Witten*, 672 N.W.2d 768, 777-78 (Iowa 2003), the court summarized that "if mutual consent cannot be achieved the status quo is preserved in the hopes that the parties may reach an agreement at some later time." The court determined that, because the parties do not agree, the "embryo is to remain frozen until the parties agree on a disposition."

Finally, after summarizing the framework provided in *Davis*, 842 S.W.2d at 603; *In re Marriage of Rooks*, 429 P.3d 579, 595 (Colo. 2018); and *McQueen v. Gadberry*, 507 S.W.3d 127, 143-47 (Mo. Ct. App. 2016), the court determined that applying the balancing test "would preclude a decision allowing for the implantation of the embryo." Specifically, the court found:

> Neither party in this case seeks to donate the embryos, therefore the parties are on equal footing regarding the first factor. Regarding the second factor, while [Jocelyn] was assessed to be infertile without the aid of IVF, she produced a child through IVF in the past and testified that she is physically capable of repeating the process. . . . No evidence in the form of expert testimony, or otherwise, was produced showing that she is incapable of having biological children through any means other than the implantation of the embryo.
> Regarding the third factor, IVF was not pursued to preserve either parties' individual ability to have children in the face of fertility implicating medical treatment, rather the parties' original reason for undertaking IVF was to have children jointly as a married couple. . . .

18

Regarding the fourth factor, the hardship for [Joshua] includes the typical hardships of unwanted parenthood. Moreover, [Joshua] already shares a child with [Jocelyn] and testified to difficulties in co-parenting. . . . Regarding the fifth factor, there is no evidence of bad faith or any attempt by either parent to use the embryo as unfair leverage in the divorce proceedings.

In sum, the court determined that "there is no outcome that permits implantation of the embryo against [Joshua's] wishes. . . . Therefore, the frozen embryo should be awarded jointly to the couple, maintaining the status quo, with the parties sharing all expenses associated with storage until mutual consent is reached." Jocelyn noted a timely appeal.

## Agreement with Cryobank

In advance of oral argument on January 11, 2021, we requested that the parties be prepared to address whether, under the following provisions of the IVF Contract entered into by the parties on September 9, 2015, the controversy has become moot:

> "In the event that embryo(s) have been in storage for five (5) years, it is the policy of FCM that the disposition of the frozen embryos should occur at that time. While the couple may elect to undertake disposition of the embryo(s) prior to that time (which may include transferring them to the uterus of the female to attempt pregnancy, transfer to another facility, disposal or donation to another couple). The Couple agrees to make a determination before the expiration of the five (5) years of storage plan.
>
> The Couple understands that FCM will provide them with a thirty (30) days advance notice that the five (5) years has elapsed, such notice to be in the form of a certified letter at the last known address as it appears in FCM's medical records. **If I/we do not respond or cannot be contacted, FCM is hereby authorized to discard any remaining frozen embryos according to laboratory procedure.**"

(Emphasis in original). In response, on the evening before oral argument counsel for Jocelyn provided this Court with a copy of the Storage Agreement with Cryobank, without further explanation.

19

The Storage Agreement states that "Cryobank will store the Embryos at its facility in accordance with applicable law and its standard policies and procedures." The Agreement further contains a section titled "Disposition of Embryos Upon Death or Divorce." This section provides:

> Clients have reached a mutual decision and are in agreement about the disposition of the Embryos in certain circumstances, as provided below, and Clients acknowledge that Cryobank will require no additional notice, consent, waiver or instructions in complying with the following:
>
> 6.1 In the event of the death of one Client, as evidenced by a certified copy of the death certificate, the surviving Client will have ownership and control of the Embryos stored with Cryobank.
>
> 6.2 In the event of the death of both Clients, the Embryos will be disposed of by thawing with no further action, which will render the Embryos permanently and irretrievably unusable for any purpose.
>
> 6.3 *In the event of legal separation or divorce of the Clients, ownership and control of the Embryos stored with Cryobank are to be specified in a divorce decree or other legally binding document, a certified copy of which will be provided to Cryobank.* Absent such documentation, ownership will remain with both Clients.
>
> 6.4 **Clients may change these instructions in the future only by providing Cryobank with new written instructions bearing the notarized signatures of both individuals.**

(Bold emphasis in original; italics and underlined emphasis added).

The Storage Agreement contains a choice of laws provision that the "validity, performance and all matters relating to the effect of this Agreement and any amendment hereto shall be governed by the laws of the Commonwealth of Virginia and the federal laws of United States of America, without regard to any conflict of law rules." The Agreement "supersedes all prior agreements among the Parties, and constitutes the entire

agreement among the Parties with regard to the subject matter hereof." It will terminate upon the occurrence of certain events, including the "failure to pay storage or other fees," in which case the "[e]mbryos will be deemed 'abandoned' by Clients, and automatically become the sole and exclusive property of Cryobank[.]" In that event, the frozen pre-embryo "may be discarded or used or donated for scientific or research purposes, but will not be used to cause pregnancy." Both parties confirmed at oral argument that the Storage Agreement replaced the IVF Contract.

## STANDARD OF REVIEW

As directed under Maryland Rule 8-131(c), when an action has been tried without a jury, we apply the clearly erroneous standard of review to the trial court's factual findings and review the court's decision for legal error. Although the issue raised in this appeal is novel, the standards that guide our review are well-established.

The "interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law subject to *de novo* review." *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 392 (2019) (citations omitted). Accordingly, we accord no deference to the circuit court's interpretation of the IVF Contract.

We generally review the circuit court's custody determination under an abuse of discretion standard. *Santo v. Santo*, 448 Md. 620, 625 (2016). Likewise, we review a trial court's distribution of marital property for abuse of discretion. *Hart v. Hart*, 169 Md. App. 151, 162 (2006). Therefore, we accord wide deference to the trial court's balancing of interests absent an enforceable agreement. Even under this deferential review, however, a court's discretion is always tempered by the requirement that the court apply the correct

21

legal standards. *Faulkner v. State*, 468 Md. 418, 460-61 (2020) (citing *Jackson v. Sollie*, 449 Md. 165, 196 (2016)); *Matter of Dory*, 244 Md. App. 177, 203 (2019) ("[T]rial courts do not have discretion to apply incorrect legal standards and a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion." (cleaned up)).

## DISCUSSION

### I.

### Legal Framework for Determining Custody of Frozen Pre-Embryos

### A. Parties' Contentions

Jocelyn and Joshua agree that the ownership of frozen and stored pre-embryos is a matter of first impression in Maryland. Jocelyn further avers that, because "neither Maryland's marital property laws," codified at Maryland Code (1984, 2019 Repl. Vol.), Family Law Article ("FL"), § 8-205, "nor Maryland's Statute on Assisted Reproduction [FL § 5-1001(d)] . . . provide an appropriate answer to the disposition of embryos, this Court must look to the law of other jurisdictions for guidance."

Jocelyn urges us to follow the majority of states that employ both the contractual approach and balancing-of-interests test to resolve this dispute over their jointly created and then frozen pre-embryo. Joshua asserts that the "contractual approach is the proper approach as the contract at issue is unambiguous and requires the mutual consent of the parties for disposition of the embryo[.]"

## B. Reproductive Autonomy and Marital Interests

Neither this Court nor the Court of Appeals has classified the legal status of a frozen pre-embryo. The Maryland General Assembly, likewise, has not addressed the subject directly.[9]

On the one hand, the frozen pre-embryo in this case has certain characteristics consistent with the broad definition of "marital property" under Maryland law. Section 8-201(e)(1) of the Family Law Article classifies "marital property" as "the property, however titled, acquired by 1 or both parties during the marriage." Jocelyn and Joshua have rights, collectively, to direct a facility holding the frozen pre-embryo to transfer, donate, or dispose of the pre-embryo, and it is clear that the pre-embryo was created during the parties' marriage.

We must also recognize, however, the parties' unique and personal interests in the cryopreserved pre-embryo and that Jocelyn believes, as do others, that "the embryo is

---

[9] The Maryland Code includes no reference to "pre-embryo" and only a few references to "embryo." The term is included in FL § 1001(d) in the definition of "assisted reproduction" as a "method of causing pregnancy other than sexual intercourse." The term is referenced in the definition of "decedent" in the Estates and Trusts Article to clarify that it is not included in the definition. Maryland Code (1974, 2017 Repl. Vol.), Trusts and Estates Article, § 4-501(d)(3). Finally, the term is referenced in the definition for "human cloning" under Part III, Stem Cell Research, in the subtitle concerning the Maryland Technology Development Corporation. Maryland Code (2008, 2018 Repl. Vol.), Economic Development Article, § 10-429(f) ("'Human cloning' means the replication of a human being through the production of a precise genetic copy of nuclear human DNA or any other human molecule, cell, or tissue in order to create a new human being or to allow development beyond an embryo.").

23

human and capable of developing into an adult."[10] The complexity of the human embryo—the science and bundle of competing interests wrapped up in it—has challenged scientists, theologians, legal scholars, and ethicists across many disciplines since ancient times.[11]

Jocelyn and Joshua's "competing interests in the disputed pre-embryo[] derive from constitutional rights in the realm of reproductive choice." *In re Marriage of Rooks*, 429 P.3d 579, 586 (Colo. 2018). At its core, reproductive autonomy "is composed of two rights of equal significance—the right to procreate and the right to avoid procreation." *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992).

The Supreme Court of the United States has recognized that procreation is a "basic civil right" and that "[m]arriage and procreation are fundamental to the very existence and survival of the race." *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942). In articulating the fundamental right to privacy grounded in the Constitution, the Supreme Court has acknowledged an individual's personal interest in procreation: "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). Mirroring the right to procreate, the Supreme Court has recognized the authority

---

[10] *See* Samuel B. Casey & Nathan A. Adams, IV, *Specially Respecting the Living Human Embryo by Adhering to Standard Human Subject Experimentation Rules*, 2 Yale J. Health Pol'y, L. & Ethics 111 (2001).

[11] Embryologist and historian, Joseph Needham, attributed the "beginnings of systematic embryological knowledge" to Hippocrates (born circa 460 B.C.E.). Joseph Needham, A History of Embryology 36 (Abelard-Schuman, 2d Ed. 1959) (1934).

of an individual to *avoid* procreation. In its landmark decision in *Griswold v. Connecticut*, the Court held that a Connecticut law banning the use of contraception unconstitutional because the law intruded on the fundamental right of marital privacy. 381 U.S. 479, 485-96 (1965).

Our Court of Appeals has likewise acknowledged the fundamental privacy interests at stake and described parenthood as an essential interest:

> At stake here is the interest of a parent in the companionship, care, custody, and management of his or her children. This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. Far more precious . . . than property rights, parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men.

*In re Adoption/Guardianship No. 10941*, 335 Md. 99, 113 (1994) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 38 (1981)).

In light of the unique, countervailing interests inherent in cryogenically preserved pre-embryos, we conclude that the frozen pre-embryo cannot be classified simply as an interest in property because it concerns interests of far broader dimension. In *Davis v. Davis*, the Supreme Court of Tennessee referenced various ethical standards from the Report of the Ethics Committee of The American Society for Reproductive Medicine, formerly known as The American Fertility Society: [12]

---

[12] The American Fertility Society's report further "call[ed] upon those in charge of IVF programs to establish policies in keeping with the 'special respect' due preembryos":

> Within the limits set by institutional policies, decision-making authority regarding preembryos should reside with the persons who have provided the gametes. . . . As a matter of law, it is reasonable to assume that the gamete

(Continued)

25

Three major ethical positions have been articulated in the debate over preembryo status. At one extreme is the view of the preembryo as a human subject after fertilization, which requires that it be accorded the rights of a person. This position entails an obligation to provide an opportunity for implantation to occur and tends to ban any action before transfer that might harm the preembryo or that is not immediately therapeutic, such as freezing and some preembryo research.

At the opposite extreme is the view that the preembryo has a status no different from any other human tissue. With the consent of those who have decision-making authority over the preembryo, no limits should be imposed on actions taken with preembryos.

A third view—one that is most widely held—takes an intermediate position between the other two. It holds that the preembryo deserves respect greater than that accorded to human tissue but not the respect accorded to actual persons.

842 S.W.2d 588 at 596 (citation omitted).[13] In light of this guidance, the *Davis* Court

concluded:

> that preembryos are not, strictly speaking, either "persons" or "property," but occupy an interim category that entitles them to special respect because of their potential for human life.

---

providers have primary decision-making authority regarding preembryos in the absence of specific legislation on the subject. A person's liberty to procreate or to avoid procreation is directly involved in most decisions involving preembryos.

*Davis,* 842 S.W. 2d at 597 (citation omitted).

[13] Although relatively few states have legislated in this area, the disparity of views, represented by the laws established so far, is stark. On one end of the spectrum, under Louisiana law, a viable pre-embryo resulting from IVF is a "juridical person" that may sue and be sued. La. Stat. Ann. §§ 9:124, 126 (2020). On the other end, for example, the Court of Appeals of Oregon interpreted section 107.105 of the Oregon Revised Statutes, to include a frozen pre-embryo within the definition of "personal property that is subject to a 'just and proper' division[.]" *In re Marriage of Dahl and Angle*, 194 P.3d 834, 839 (2008).

*Id.* at 597.[14]

We agree with those courts that recognize the special respect due cryopreserved pre-embryos in light of their potential for human life as well as the fundamental and coextensive rights of their progenitors to decide "whether to bear or beget a child." *Eisenstadt,* 405 U.S. at 453. Recognizing the unique interests involved, we turn to consider the various approaches used by courts to determine a party's rights to a cryopreserved pre-embryo.

### C. Three Common Law Approaches

Without Maryland caselaw to guide our inquiry, we look to other states that have addressed the issue of who should be awarded, upon dissolution of the progenitors' marriage or partnership, any remaining frozen pre-embryos that were created by the couple through in vitro fertilization. As mentioned above, courts have utilized or combined aspects of three analytical approaches: (1) the contractual approach; (2) the contemporaneous mutual consent approach; and (3) the balancing approach. *Rook*, 429 P.3d at 587; *Reber v. Reiss*, 42 A.3d 1131, 1134 (Pa. Super Ct. 2012).[15]

---

[14] Other courts have categorized pre-embryos as "marital property of special character," recognizing "that pre-embryos contain the potential for human life and are formed using genetic material from two parties with significant, but potentially competing, interests in their ultimate disposition." *Rooks*, 429 P.3d at 591; *see also McQueen v. Gadberry*, 507 S.W.3d 127, 149 (Mo. Ct. App. 2016) ("Though frozen pre-embryos may never realize their biologic potential, even if implanted, they are unlike traditional forms of property or external things because they are comprised of a woman and man's genetic material, are human tissue, and have the potential to become born children.").

[15] Even "[w]ithin these approaches, courts generally agree that when the parties state their unambiguous intent with respect to the disposition of frozen embryos, such

(Continued)

## 1. The Contractual Approach

Under this approach, the court first "look[s] to any prior agreements between the parties regarding the disposition of cryopreserved pre-embryos." *Reber*, 42 A.3d at 1134. This approach recognizes:

> Agreements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them. Indeed, parties should be encouraged in advance, before embarking on IVF and cryopreservation, to think through possible contingencies and carefully specify their wishes in writing. Explicit agreements avoid costly litigation in business transactions. They are all the more necessary and desirable in personal matters of reproductive choice, where the intangible costs of any litigation are simply incalculable.

*Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) (citation omitted).[16]

---

agreements will be dispositive." Michael T. Flannery, *Rethinking Embryo Disposition upon Divorce*, 29 J. Contemp. Health L. & Pol'y 233, 238 (2013). A minority of courts, however, have concluded that such agreements may be unenforceable as against public policy. *See, e.g., A.Z. v. B.Z.*, 725 N.E.2d 1051, 1056-57 (Mass. 2000) (determining that the court "would not enforce an agreement that would compel one donor to become a parent against his or her will"); *J.B. v. M.B.*, 783 A.2d 707, 719 (N.J. 2001) (adopting a rule "to enforce agreements entered into at the time in vitro fertilization is begun, subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored pre-embryos").

[16] Scholars and professional organizations urge states to pass legislation requiring couples to identify what should become of their cryopreserved pre-embryos in the event of divorce or dissolution of their partnership. *See, e.g.,* Flannery, *supra*, at 235. The Supreme Court of Connecticut observed that,

> various professional associations focusing on the field of reproductive medicine recommend that progenitors provide advance directives regarding disposition of their pre-embryos in various scenarios, including divorce. *E.g.*, Ethics Committee of the American Society for Reproductive Medicine, "Disposition of Abandoned Embryos: A Committee Opinion," 99 Fertility & Sterility 1848, 1848 (2013), available at https://www.asrm.org/globalassets/asrm/asrm-content/news-and-

(Continued)

In *Szafranski v. Dunston*, the Appellate Court of Illinois held that the parties, Jacob and Karla, "reached a binding oral contract concerning the use of pre-embryos that, unless modified or contradicted, remained in full force and effect." *Szafranski v. Dunston (Szafranski II)*, 34 N.E.3d 1132, 1155 (Ill. App. Ct. 2015). Because no other agreement overrode the parties' oral contract, the Court held that it controlled. *Id.*

In that case, Karla was diagnosed with lymphoma and expected to suffer infertility as a result. *Id.* at 1136. She delayed chemotherapy, despite pain and against her oncologist's objections, in order to harvest and freeze pre-embryos so that she may be able to have a biological child on a later date. *Id.* at 1137. "Nervous" about using an anonymous sperm donor, "Karla asked if [Jacob] would 'be willing to provide sperm to make pre-embryos with her.' He responded 'yes,' telling Karla that he wanted to help her have a child." *Id.* at 1138.

The couple met with staff at Northwestern Hospital the next day regarding the creation of the pre-embryos and for Jacob to deposit sperm to create the pre-embryos. *Id.* There, Jacob and Karla executed an "Informed Consent for Assisted Reproduction" form. *Id.* Later that day, the couple met with an attorney to discuss a co-parenting agreement.

---

publications/ethics-committee-pinions/disposition_of_abandoned_embryos-pdfmembers.pdf (last visited October 29, 2019); *see also* American Medical Association, Code of Medical Ethics (2017) Opinion 4.2.5, pp. 70–71. Advance directives provide practical certainty for storage facilities, reduce the likelihood of abandonment, and ensure that facilities will be able to satisfy their ethical obligations.

*Bilbao v. Goodwin*, 217 A.3d 977, 988 (Conn. 2019).

*Id.* at 1139. Although a draft was prepared, the proposed agreement was never signed. *Id.* The couple then returned to Northwestern a few weeks later, where Karla's eggs were retrieved, and Jacob deposited additional sperm. *Id.* Following the procedure, the parties agreed to fertilize all the eggs retrieved from Karla, and, ultimately, three eggs were successfully fertilized. *Id.* at 1140. Karla began chemotherapy the next day. *Id.*

Several months later, the parties' relationship ended. *Id.* at 1140. Jacob then filed a complaint seeking to enjoin Karla from using the pre-embryos, and Karla counterclaimed and sought sole custody over the pre-embryos. *See Szafranski v. Dunston (Szafranski I)*, 993 N.E.2d 502, 505 (Ill. App. Ct. 2013) (summarizing procedural history through first appeal). Following an initial appeal, the case proceeded to a two-day trial. *Szafranski II*, 34 N.E.3d at 1142. The trial court awarded Karla "sole custody and control" of the pre-embryo because (1) the parties entered into an enforceable oral agreement and (2) the Informed Consent did not contradict or modify the oral contract. *Id.* at 1146-47. Jacob appealed. *Id.* at 1147.

The Appellate Court first "emphasize[d] that Jacob concedes that a[n oral] contract was formed":

> Significantly, Jacob does not challenge the finding that an oral contract was created . . . when Karla asked him if he would be willing to donate his sperm to create pre-embryos with her, and he manifested his acceptance of Karla's offer by responding "yes."[] The parties both acknowledge that Jacob agreed to donate his sperm after Karla told him that she would likely become infertile after her chemotherapy treatment. Both parties further acknowledged, through trial testimony, that the purpose of the oral contract was for Jacob to provide his sperm to fertilize Karla's eggs so that she could preserve her ability to have a biologically related child of her own in the future, after her chemotherapy treatment ended. Finally, it is undisputed that the parties knew that the pre-embryos would have to be cryopreserved for

30

> later use and that they would not be transferred to Karla for implantation, at the earliest, until after she finished her chemotherapy treatment.

*Id.* at 1148-49 (footnote omitted).

Jacob contended that, although he agreed to provide his sperm, he did not "consent to their possible use at some unknown time in the future." *Id.* at 1149. Because "great weight should be given to the principal apparent purpose and intention of the parties at the time of contracting," the Court found "no error in the circuit court's finding that the parties intended to allow Karla to use the pre-embryos without limitation when they formed an [oral] contract." *Id.* at 1151 (citation omitted). Specifically, according to Jacob's own testimony, "he never communicated a desire to have any say in Karla's future disposition of the pre-embryos; his only concern was to help her take the necessary steps to preserve her ability to create pre-embryos for that purpose." *Id.* at 1149-50.

The Court then determined that the Informed Consent "neither modified nor contradicted the parties' oral agreement." *Id.* at 1154. Rather, the Informed Consent "contemplated the parties reaching a separate agreement as to disposition and did not contain any language that would override the parties' prior agreement." *Id.* at 1155. Of key significance to the Court, "the provision requiring both parties to consent to use of the pre-embryos ***does not bar a situation in which the parties have reached an advance agreement—oral or written—concerning disposition.***" *Id.* (emphasis added). Rather than dictate the parties' intent, the Informed Consent "merely advised the parties that Northwestern had no legal right to use or dispose of the pre-embryos in any manner that either Jacob or Karla would find objectionable." *Id.*

31

Further, while the Informed Consent identified certain events that would require "a decision as to disposition" and dictated "what will happen to the pre-embryos," it was silent "in the event an unmarried couple separates." *Id.* at 1156. The Court explained:

> Northwestern specifically addressed how the couple's pre-embryos will be disposed of in three different situations—divorce, death of one partner, and death of both partners—but, significantly, it did not address how their pre-embryos would be treated in the event that they separated. This can mean only one thing: that neither the couple nor Northwestern, in executing the Informed Consent, considered what would happen to the pre-embryos in that event. There is no doubt that Northwestern was aware of the possibility that an unmarried couple might separate; it expressly stated in the Informed Consent that it was important for the couple to decide what would happen in that situation. It nonetheless remained silent as to what would happen to the couple's pre-embryos if they separated, choosing instead to address what would happen in other specific situations. Under the circumstances, we can only interpret this as a purposeful omission.

*Id.* at 1156. The Court concluded that "[b]ecause we agree with the circuit court's finding that the Informed Consent neither contradicts nor modifies the [] oral agreement, we find no basis to reverse the circuit court's ruling that Karla is entitled to control and custody of the pre-embryos." *Id.* at 1161.

Courts have also enforced clear and unambiguous provisions in standard forms from fertility clinics, hospitals, and storage centers when they reflect the parties' mutual agreement and intent. This was the case in *In re Marriage of Dahl and Angle*, when the Court of Appeals of Oregon ordered the parties' frozen pre-embryos destroyed, thereby giving "effect to the agreement" they entered into at the time that they underwent the IVF process. 194 P.3d 834, 842 (Or. App. 2008). The husband and wife had executed an "Embryology Laboratory Specimen Storage Agreement . . . that detailed the terms of storage of embryos created through the IVF procedure." *Id.* at 836. A paragraph in the

32

agreement allowed the parties to direct transfer of the pre-embryos by "written joint authorization" or, if "unable or unwilling to execute a joint authorization, the [parties] hereby designate the following [spouse] or other representative to have sole and exclusive right to authorize and direct [the laboratory] to transfer or dispose of the Embryos[.]" *Id.* Below this paragraph, the wife's name was printed in the designated space, next to both parties' initials. *Id.*

When the parties later decided to dissolve their marriage, they could not agree on the "disposition of six frozen embryos." *Id.* The wife wanted the pre-embryos destroyed, whereas the husband wanted them donated to another couple. *Id.* at 837. The trial court determined that the terms of the contract controlled and directed that the pre-embryos be destroyed. *Id.* On appeal, the Court of Appeals agreed that the agreement "evinced the parties' intent." *Id.* at 841. The Court explained:

> Although the agreement did not specifically state that the couple was selecting options for disposition of the embryos in the event of marital dissolution or separation, the parties contemplated the contingency of their not being able to reach agreement on the disposition of the embryos, and they selected wife to be the primary decision maker in that regard. Further, the parties were given choices when they entered the agreement on possible disposition of the embryos.

*Id.* Because the "parties designated wife to be the decision maker" and her "stated preference" was destruction, the Court held that the trial court did not abuse its discretion by giving "effect to the agreement." *Id.* at 842.

Proponents of the contractual approach contend that it allows the parties "—not the state and not the courts—to make this deeply personal choice." *Bilbao v. Goodwin*, 217 A.3d 977, 984 (Conn. 2019) (quoting *Kass*, 696 N.E.2d at 180). Appropriate agreements

33

"minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision." *Kass*, 696 N.E.2d at 180; *see also* Flannery, *supra*, at 275 (noting that the contractual approach "provides predictability and assures autonomous decision-making"). Further, this approach "promotes serious discussion between the progenitors in advance of divorce, gives progenitors and storage facilities a measure of certainty to plan for the future, and helps avoid costly and emotionally taxing litigation." *Bilbao*, 217 A.3d at 984.

Opponents focus on the rigidity of the approach, because it "binds individuals to previous obligations, even if their priorities or values change." *In re Marriage of Witten*, 672 N.W.2d 768, 777 (Iowa 2003) (citation omitted). More fundamentally, one commentator has asserted that the contractual approach "insufficiently protects the individual and societal interests at stake":

> First, decisions about the disposition of frozen embryos implicate rights central to individual identity. On matters of such fundamental personal importance, individuals are entitled to make decisions consistent with their contemporaneous wishes, values, and beliefs. Second, requiring couples to make binding decisions about the future use of their frozen embryos ignores the difficulty of predicting one's future response to life-altering events such as parenthood. Third, conditioning the provision of infertility treatment on the execution of binding disposition agreements is coercive and calls into question the authenticity of the couple's original choice. Finally, treating couples' decisions about the future use of their frozen embryos as binding contracts undermines important values about families, reproduction, and the strength of genetic ties.

Carl H. Coleman, *Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes*, 84 Minn. L. Rev. 55, 88-89 (1999) (footnotes omitted).

As we explain below, resolving such cases solely upon the parties' "contemporaneous wishes" would effectively give one party de facto veto power within the often-turbulent setting of divorce and separation. In scenarios similar to *Szafranski v. Dunston II*, where one party relies on the party's prior agreement, to allow the breaching party to change that party's mind not only impedes the other party's procreative rights but contradicts key features of Maryland contract law. Instead, honoring the intent of parties in express agreements allows the parties to make this personal choice, cognizant of the consequences, while providing a degree of certainty. Nevertheless, as further detailed below, due to the proliferation of form contracts in this sphere,[17] we conclude that a blended

---

[17] At least one commentator has gone so far as to assert that these agreements customarily "encrypted in informed consent documents smack of unconscionability." Ellen A. Waldman, *Disputing Over Embryos: Of Contracts and Consents*, 32 Ariz. St. L.J. 897, 926 (2000). In a recent article in the *New York Times*, one of the subjects—a communications director who separated from his husband last year—"would advise couples trying to have a family through I.V.F. to draw up a legal contract detailing each partner's rights rather than to rely solely on the fertility clinic forms." Jenny Gross & Maria Cramer, *Latest Issue in Divorces: Who Gets the Embryos?*, N.Y. Times, Apr. 4, 2021, at A19. The same article relates the story of Dr. Mimi Lee, who, together with her husband, underwent the IVF process and froze their pre-embryos prior to Dr. Lee's cancer treatment:

> They produced five healthy embryos and froze them for when they would be ready to have children. Three years later, when they divorced, Dr. Lee wanted to use the embryos, but her husband sued to prevent her from doing so. The judge upheld the agreement that they had signed at the fertility clinic, saying that the embryos could be brought to term only with the consent of both partners.

(Continued)

35

contractual/balancing approach is consistent with Maryland law and most appropriately protects all interests involved.

## 2. The Contemporaneous Mutual Consent Approach

In response to the perceived harshness of binding parties in the face of changed circumstances, a minority of courts apply the contemporaneous mutual consent approach, which allows a party to "change his or her mind about disposition up to the point of use or destruction of any stored embryo," regardless of any prior agreement. *In re Marriage of Witten*, 672 N.W.2d 768, 782 (Iowa 2003) (citation and quotation marks omitted); *see also A.Z. v. B.Z.*, 725 N.E.2d 1051, 1053-55 (Mass. 2000). "Proponents of the mutual-consent approach suggest, with respect to 'decisions about intensely emotional matters, where people act more on the basis of feeling and instinct than rational deliberation,' it may 'be impossible to make a knowing and intelligent decision to relinquish a right in advance of the time the right is to be exercised.'" *Witten*, 672 N.W.2d at 777 (citations omitted). By emphasizing that consent is always essential, they contend that this approach "leaves this highly personal choice in the hands of donors," *In re Marriage of Rooks*, 429 P.3d 579, 596 (Colo. 2018) (Hood, J., dissenting) (citing *Witten*, 672 N.W.2d at 783), and allows for

---

Dr. Lee, 52, said she did not even remember signing the form at the clinic. "My state of mind at the time was complicated by cancer, being a newlywed and just this hope and opportunity to have children," she said. "It was unfathomable that that's what would eventually determine that my last chance of having biological children would be taken away from me."

*Id.*

36

a person to withdraw from an agreement that "no longer reflects his or her current values or wishes." *Witten*, 672 N.W.2d at 783.

In *A.Z. v. B.Z.*, the Supreme Judicial Court of Massachusetts determined that it "would not enforce an agreement that would compel one donor to become a parent against his or her will." 725 N.E.2d at 1057. There, a husband and wife had four pre-embryos in storage at an IVF clinic at the time of the parties' divorce. *Id.* at 1053. The parties had successfully conceived through IVF, and the wife gave birth to twin daughters. *Id.* Before each successive IVF procedure at the clinic, the parties signed a consent form, which provided, in pertinent part, "should [the parties] become separated, they both agree[d] to have the embryo(s) . . . return[ed] to [the] wife for implant." *Id.* at 1054. The form also allowed the parties to "change their minds as to any disposition, provided that both donors convey that fact in writing to the clinic." *Id.* Upon the couple's divorce, the wife wished to use the pre-embryos to become pregnant, while the husband wished for the embryos to be destroyed. *Id.* at 1054-55.

The Court refused to honor the agreement for three "independent" reasons. *Id.* at 1056. First, the Court determined that the "consent form's primary purpose is to explain to the donors the benefits and risks of freezing, and to record the donors' desires for disposition of the frozen preembryos at the time the form is executed" and was not intended "to act as a binding agreement between [the parties] should they later disagree as to the disposition." *Id.* Second, the consent form did not contain a duration provision. *Id.* The Court declined to "assume that the donors intended the consent form to govern the disposition of the frozen preembryos four years after it was executed, especially in light of

37

the fundamental change in their relationship (i.e., divorce)." *Id.* at 1057. Finally, the consent form contemplated the parties becoming "separated" without defining "becoming separated." *Id.* The Court observed that "[b]ecause this dispute arose in the context of a divorce, [the Court could not] conclude that the consent form was intended to govern in these circumstances" because of the distinct legal meanings of separation and divorce. *Id.*

Notwithstanding these reasons, the Court explained that it previously "expressed its hesitancy to become involved in intimate questions inherent in the marriage relationship" and "'would not order either a husband or a wife to do what is necessary to conceive a child or to prevent conception, any more than we would order either party to do what is necessary to make the other happy.'" *Id.* at 1058 (quoting *Doe v. Doe*, 314 N.E.2d 128, 132 (Mass. 1974)). Likewise, based on its prior decisions, the Court "indicated a reluctance to enforce prior agreements that bind individuals to future family relationships." *Id.* Accordingly, the Court held that "prior agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions." *Id.* at 1059.

Since Massachusetts and Iowa adopted the contemporaneous mutual consent approach, courts have roundly criticized it as "totally unrealistic" because, "[i]f the parties could reach an agreement, they would not be in court[.]" *Reber v. Reiss*, 42 A.3d 1131, 1135 (Pa. Super. Ct. 2012). While this approach seeks to protect each party's procreational autonomy by allowing them to change their mind, critics contend that, in actuality, it "gives no weight to the constitutional rights of the party seeking to become a parent because their wishes are dependent upon the opposing party's consent." Caroline Strohe, *The Fate of*

38

*Frozen Embryos after Divorce: A Call for Courts to Properly Balance Procreative Freedom*, 66 Loy. L. Rev. 263, 285 (2020). The approach is also denounced because it creates a "de facto veto over the other party by avoiding any resolution until the issue is eventually mooted by the passage of time." *Rooks*, 429 P.3d at 589. Additionally, such an approach could "give each progenitor a powerful bargaining chip at a time when individuals might very well be tempted to punish their soon-to-be ex-spouses," "[which] makes no sense and may invite individuals to hold hostage their ex-partner's ability to parent a biologically related child in order to punish or to gain other advantages." Mark P. Stasser, *You Take the Embryos But I Get the House (and the Business): Recent Trends in Awards Involving Embryos Upon Divorce*, 57 Buff. L. Rev. 1159, 1225 (2009).

### 3. The Balancing Approach

In the absence of a valid agreement, courts often balance the interests of the parties to determine disposition of frozen pre-embryos under a framework first established by the Supreme Court of Tennessee in *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992). There, a husband and wife disagreed on how to dispose of their frozen pre-embryos after the dissolution of their marriage. *Id.* at 589. At first, the wife wanted to use the pre-embryos to have children, although she later remarried and wished instead to donate the pre-embryos to "a childless couple." *Id*. at 590. The husband initially "preferred to leave the embryos in their frozen state until he decided whether or not he wanted to become a parent outside the bounds of marriage," and later "adamantly opposed" donation of the embryos, wishing instead for them to be discarded. *Id*. at 589-90. The parties did not have a written agreement governing the storage or disposition of the embryos. *Id.* at 598.

The Court instructed that, "as a starting point, [] an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors." *Id.* at 597. After determining that there was no valid agreement between the parties, the Supreme Court of Tennessee resolved the dispute by balancing "the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions." *Id*. at 603. Specifically, the Court balanced "two aspects of procreational autonomy—the right to procreate and the right to avoid procreation." *Id*. In balancing the parties' interests, the court considered the burden of unwanted parenthood on the husband—particularly in light of problems caused by separation from his parents as a boy—against the wife's interest in donating the pre-embryos to another couple for implantation to avoid the burden of knowing the lengthy IVF procedures were futile. *Id.* at 603-04. Ultimately, the Court concluded that the wife's "interest in donation is not as significant as the interest [the former husband] has in avoiding parenthood." *Id*. While the wife's interest in donation "is not an insubstantial emotional burden," the Court concluded this interest is not as compelling as the husband's interest in avoiding parenthood, because if the wife were "allowed to donate these preembryos, he would face a lifetime of either wondering about his parental status or knowing about his parental status but having no control over it." *Id.* The Court noted that "[t]he case would be closer if [the wife] were seeking to use the preembryos herself, but only if she could not achieve parenthood by any other reasonable means." *Id*.

In sum, the Court explained that courts should resolve disputes concerning the disposition of pre-embryos:

> first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed. Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question. If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered. However, if the party seeking control of the preembryos intends merely to donate them to another couple, the objecting party obviously has the greater interest and should prevail.

*Id.* at 604.

Conversely, in *Reber v. Reiss*, the Superior Court of Pennsylvania, one of Pennsylvania's two intermediate appellate courts, concluded that a wife's interest to procreate by using the pre-embryos outweighed her husband's interest to avoid procreation. 42 A.3d 1131, 1142 (Pa. Super. Ct. 2012). There, a husband appealed from a final divorce decree in which the court awarded his former wife frozen pre-embryos created by the parties during their marriage. *Id.* at 1132. The pre-embryos were created before the wife underwent extensive treatment for breast cancer but were not used before the husband filed for divorce in 2006. *Id*. at 1133. The wife sought all 13 cryogenically preserved pre-embryos for implantation, and the trial court "concluded that while 'ordinarily the party wishing to avoid procreation should prevail, in our balancing of the facts unique to this case, we find that [w]ife's inability to achieve biological parenthood without the use of the

41

pre-embryos is an interest which outweighs Husband's desire to avoid procreation.'" *Id.* at 1133-34.

On appeal, the Court considered all three approaches. Because there was no agreement governing the disposition of the pre-embryos[18] and no chance that the parties would "come to a contemporaneous mutual agreement regarding the pre-embryos," the Court held that the balancing approach was the most suitable test. *Id.* at 1136.

Upon balancing the parties' interests in the pre-embryos, the Court pointed out that, despite the fact that the wife did not produce medical evidence, the "trial court concluded that [w]ife has no ability to procreate biologically without the use of the disputed pre-embryos." *Id.* at 1137-38. The Court held that the wife's testimony on this issue was sufficient, taking into consideration the impact of her cancer treatments and age on her ability to achieve parenthood. *Id.* at 1138. The Court also noted that the wife's ability to adopt was distinct from her ability to "procreate biologically" and that many adoption agencies would not consider a single woman with health concerns. *Id.* at 1139.

The Court considered the husband's wish to avoid unwanted procreation based on three chief concerns: (1) his right to be involved in his child's life; (2) his agreement to participate in IVF only as a "safeguard" to preserve his wife's fertility; and (3) the potential financial burdens of child support. *Id.* at 1140-41. Regarding the husband's first contention, the wife testified that he would "have the option to be part of the child's life,"

---

[18] Although there was an agreement about storage of the pre-embryos, the Court held that it could not "be read as an agreement between [h]usband and [w]ife to destroy the pre-embryos at the end of three years; rather, it is an agreement between the two of them and [the IVF facility] about the storage of the pre-embryos." *Id.* at 1136.

alleviating this concern. *Id.* at 1140. Second, the Court reasoned that "[c]learly, [h]usband knew the potential result of his participation in IVF was going to be a child at some point in the future. The safeguard was to guard against the very situation where [w]ife could not have a biological child. That is the situation she is in now." *Id.* at 1140-41. Regarding the potential financial burden of support, the Court noted that these "concerns must be considered in light of [w]ife's agreement to do her best to assure that [h]usband never has to pay to support the child or children." *Id.* at 1141. While the Court noted, under Pennsylvania law, a party could not bargain away a "child's right to support," it did specify that parties could "make an agreement as to child support if it is fair and reasonable, made without fraud or coercion, and does not prejudice the welfare of the children." *Id.* (citations omitted). However, both the trial court and the appellate court "did not rely on the [wife's] vow and appropriately left open such a determination until the issue becomes an actual case or controversy before the court." *Id.* at 1141-42.

Finally, the Court rejected the husband's "overarching argument that it is against Pennsylvania public policy to force him to procreate" because "public policy is silent on the issue" and "unless and until our legislature decides to tackle this issue, our courts must consider the individual circumstances of each case." *Id.* at 1142. On balance, the Court affirmed the judgment of the trial court, reasoning that, because "these pre-embryos are likely [w]ife's only opportunity to achieve biological parenthood and her best chance to achieve parenthood at all . . . the balancing of the interests tips in [w]ife's favor." *Id.* at 1142.

More recently, in *In re Marriage of Rooks*, the Colorado Supreme Court refined the balancing test first enunciated in *Davis* by: (1) listing the non-exhaustive factors for courts to consider, 429 P.3d 579, 593-94 (Colo. 2018); (2) replacing the *Davis* Court's instruction that "[o]rdinarily, the party wishing to avoid procreation should prevail," 842 S.W.2d at 604, with the directive that "courts should strive to award pre-embryos in a manner that allows both parties to exercise their rights to procreational autonomy," 429 P.3d at 586, 592; and (3) delineating certain improper considerations, *id.* at 594.

In *Rooks*, a couple used IVF to have their three children born during the parties' marriage. *Id.* at 581. The parties signed a "Disposition Plan" that specified "in the event of divorce or dissolution of marriage, 'the disposition of our embryos will be part of the divorce/dissolution decree paperwork'" and that, if this paperwork did not address disposition, the pre-embryos "should be thawed and discarded." *Id.* at 582-83. Ultimately, the couple divorced and disagreed over what to do about their frozen pre-embryos. *Id.* at 583. The wife wished to preserve the pre-embryos for future implantation as "she wished to have more children but, to her knowledge, she was not able to have further children 'naturally.'" *Id.* The husband did not want more children from his relationship with his wife and desired that the pre-embryos be thawed and discarded. *Id.*

After an evidentiary hearing, the trial court evaluated the dispute under the balancing test, "weighing [the husband's] 'inherent privacy right not to conceive children' against [his wife's] 'right to become a parent.'" *Id.* The trial court reasoned that the husband had a right to "avoid the burdens of parenthood" and posited that additional children "could be detrimental" to the existing children. *Id.* at 583-84. Regarding the

44

wife's desire to use the pre-embryos to have additional children, the trial court reasoned that, because she "already had three children, discarding the pre-embryos would not deprive her of her only chance to become a mother" and "expressed concerns about [her] financial ability to provide for another child[.]" *Id.* at 584. Accordingly, the court determined that the husband's interest outweighed the wife's and awarded the pre-embryos to him. *Id.* After the court's decision was affirmed by the intermediate appellate court, the Supreme Court of Colorado granted certiorari. *Id.* at 585.

Consistent with the framework first outlined in *Davis*, the Colorado Supreme Court directed that these disputes "should be resolved first by looking to an existing agreement expressing the spouses' intent in the event of divorce." *Id.* at 593. "[I]n the absence of an enforceable agreement . . ., and where the parties have turned to the courts to resolve their dispute, the dissolution court should balance the parties' respective interests" while "[r]ecognizing a couple's cryogenically preserved pre-embryos as marital property of a special character." *Id.* Grounding this determination is "the parties' individual interests in either achieving or avoiding genetic parenthood through use of the disputed pre-embryos." *Id.* To balance these interests, the court identified non-exhaustive factors for a court to weigh. *Id.* These include:

(1) "the intended use of the party seeking to preserve the disputed pre-embryos" because, for example, a party who seeks to implant the pre-embryo "has a weightier interest than one who seeks to donate";

(2) "the demonstrated physical ability (or, conversely, inability) of a party seeking to implant the disputed pre-embryos to have biological children through other means";

45

(3) "the parties' original reasons for pursuing IVF, which may favor preservation over disposition";

(4) "hardship for the person seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations";

(5) "either spouse's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce proceedings"; and

(6) other factors "relevant on a case-by case basis."

*Id.* at 593-94. Conversely, the Court identified three "improper considerations." *Id.* at 594. First, the Court declined "to adopt a test that would allow courts to limit the size of a family based on financial and economic distinctions." *Id.* Second, the Court instructed that courts should not consider "the sheer number of a party's existing children, standing alone" as a reason to preclude preservation or use of the pre-embryo. *Id.* Finally, the court declined to consider adoption as a suitable alternative as "the relevant interest at stake is the interest in achieving or avoiding *genetic* parenthood." *Id.* Because the circuit court and intermediate appellate court analyzed inappropriate factors, the Court reversed and remanded to the trial court for it to balance the parties' interests. *Id.* at 595.

Most courts "use the balancing approach as a second step, only to be employed after it is determined that no enforceable agreement between the progenitors exists and, thus, that the contractual approach does not resolve the issue." *Bilbao*, 217 A.3d at 985.[19] By

---

[19] The State of New Jersey has adopted the balancing test as the sole means of resolving the disposition of pre-embryos. *J.B. v. M.B.*, 783 A.2d 707, 718 (N.J. 2001). Its Supreme Court determined that this approach was consistent with its state's public policy "against enforcing private contracts to enter into or terminate familial relationships" because enforcing a contract when one party reconsidered their earlier acquiescence would force that party "to become a biological parent against his or her will." *Id.* at 717-18.

focusing first on the agreement, the fate of the pre-embryo is first placed "in the hands of the progenitors" and only after, if necessary to resolve the dispute, in the "hands of a court." *Id.* Critics of the balancing test fundamentally disapprove of the courts' participation in deciding the issue. Judge Hood, in his dissent in *Rooks*, criticized the approach as forcing courts "to mediate a fundamentally personal decision and, in the process, infringe on a litigant's constitutional rights." *Rooks*, 429 P.3d at 596 (Hood, J., dissenting). Contrary to the contemporaneous mutual consent approach, which Judge Hood argues ensures that the parties alone make the decision, the test "places the state directly between two people in a decision that 'fundamentally affect[s]' their lives." *Id.* at 598 (Hood, J., dissenting) (citation omitted). For the non-consenting donor, there are several harms that may be inflicted, each of which derives "from the unwanted existence of a child to whom one stands in relationship of parent." *See* I. Glenn Cohen, *The Right Not to Be a Genetic Parent?*, 81 S. Cal. L. Rev. 1115, 1135 (2008).

Having examined various approaches employed in other jurisdictions, we turn to address how trial courts should resolve similar disputes in Maryland.

### D. Resolution of Disputes in Maryland

We hold that disputes that arise during dissolution of the parties' marriage or partnership involving the custody of cryogenically preserved pre-embryos should be resolved utilizing a blended contractual/balancing-of-interests approach, first enunciated in *Davis v. Davis*, 842 S.W.2d 588 (1992), further refined through the non-exhaustive and inappropriate factors delineated in *In re Marriage of Rooks*, 429 P.3d 579 (2018) and the special considerations concerning third-party form contracts identified in this opinion. In

47

adopting this approach, we recognize the directive, detailed in both *Davis* and *Rooks*, that "a court should strive, where possible, to honor both parties' interests in procreational autonomy." *Rooks*, 429 P.3d at 592; *see also Davis*, 842 S.W.2d at 597 ("the progenitors, having provided the gametic material giving rise to the preembryos, retain decision-making authority as to their disposition").[20]

Accordingly, a court should first "look[] to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is [a] dispute, then their prior agreement concerning disposition should be carried out." *Davis*, 842 S.W.2d at 604. In analyzing an agreement, courts should take particular care to ensure that it manifests the progenitors' actual preferences. Given the pervasiveness of third-party informed consent agreements, we emphasize that the progenitors—not fertility centers—must expressly and affirmatively designate their own intent. *See Szafranski v. Dunston (Szafranski II)*, 34 N.E.3d 1132, 1157 (Ill. App. Ct. 2015) (analyzing cases where "courts have found a couple's dispositional intent to have been expressed in an IVF-related agreement"). Boilerplate language in a third-party form contract may not qualify as an express agreement between progenitors regarding who should have custody of their jointly created pre-embryo in the event of the dissolution of their relationship. *See Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706 (2015) ("An express contract has been defined as an actual

---

[20] The *Davis* Court surmised, without further discussion, that "[o]rdinarily, the party wishing to avoid procreation should prevail" *Davis*, 842 S.W.2d at 604. Given that the Court described both parties as having equally valid, constitutionally derived procreative rights, we struggle to see why the party who desires to avoid procreation should be accorded greater respect than the party who desires to procreate.

agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." (citation omitted)); *see also Klebe v. United States*, 263 U.S. 188, 192 (1923) ("express contract speaks for itself and leaves no place for implications").

Such form contracts should be examined with "special care." *Walther v. Sovereign Bank*, 386 Md. 412, 430-31 (2005); *see also Doyle v. Fin. Am., LLC*, 173 Md. App. 370, 376 n.3 (2007) (defining an adhesion contract "as one 'that is drafted unilaterally by the dominant party and then presented on a "take-it-or-leave-it" basis by the weaker party who has no real opportunity to bargain about its terms.'" (citation omitted)). In cases where the contract fails to manifest the *progenitors'* intent, our courts should not hesitate to turn to the balancing test to determine the progenitors' constitutionally derived procreative rights.

The framework set out above provides predictability by focusing most prominently on the "four corners" of any prior agreement and promotes serious discussion between the parties *before* divorce, separation, and other potentialities. Courts are urged to analyze whether the prior agreement reflects the progenitors' desires and actual choices concerning what to do with any remaining frozen pre-embryos. Otherwise, our courts risk enforcing form contracts that reflect a fertility center's policy, rather than the parties' intentions. *See A.Z. v. B.Z.*, 725 N.E.2d 1051, 1056 (Mass. 2000) (consent form was not intended "to act as a binding agreement between [the parties] should they later disagree"). By focusing initially on the prior agreement, the determination about what to do with the pre-embryo is

first placed "in the hands of the progenitors" and only after, if necessary to resolve the dispute, in the "hands of a court." *Bilbao*, 217 A.3d at 985.

In adopting this framework, we join the majority of courts that have rejected the mutual contemporaneous consent approach. We agree that this approach is "totally unrealistic" because the parties are in court precisely because they cannot come to mutual agreement about what to do with the remaining frozen pre-embryo(s). *Reber*, 42 A.3d at 1135 n.5. Instead of directing the parties to a resolution, the mutual contemporaneous consent approach gives the party who wishes to maintain the status quo a de facto veto until the viability of the frozen pre-embryo is voided through the passage of time. *Rooks*, 429 P.3d at 592; *Davis*, 842 S.W.2d at 598. While proponents aver that the contemporaneous mutual consent approach protects procreational autonomy, in actuality, it results in "asymmetrical consequences" and deprives parties of the benefit of their bargain. *Bilbao*, 217 A.3d at 987; *see also* Strohe, *supra*, at 285 (arguing that the approach "gives no weight to the constitutional rights of the party seeking to become a parent because their wishes are dependent upon the opposing party's consent").

We also note that this approach is inconsistent with Maryland law. The Maryland General Assembly has acknowledged that a married couple may make an enforceable agreement relating to "alimony, support, property rights, or personal rights." FL § 8-101. Our Court of Appeals recognizes "the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle." *Maryland-Nat'l Cap. Park &*

50

*Plan. Comm'n v. Washington Nat. Arena*, 282 Md. 588, 606 (1978). Similarly, this Court, in adopting the reasoning set forth in 17A Am. Jur. 2d Contracts § 264 (1991), recognized:

> Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. . . . [I]f there is one thing which more than another public policy requires it is that persons of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced by courts of justice.

*Clark v. O'Malley*, 186 Md. App. 194, 224 (2009).

Having set forth the framework to determine who should be awarded, upon dissolution of the progenitors' marriage or partnership, any remaining frozen pre-embryos, we now turn to consider whether the IVF Contract evinces Joshua and Jocelyn's intent and resolves this dispute.

## II.

### The IVF Contract

Jocelyn avers that the "parties' IVF Contract does not resolve the disposition of the embryo." Specifically, she contends that the "lower court clearly misinterpreted the language of the IVF Contract. While the IVF Contract expressly contemplates disposition of the frozen embryos in the case of donor egg or sperm, no such language appears in reference to an embryo resulting from the gametes of both parties." She further contends that the circuit court erred "when it construed the IVF Contract without giving effect to the court's ability to make a determination in the event a dispute arises[.]" According to

51

Jocelyn, this has resulted in the disfavored contemporaneous mutual consent approach governing the parties' relationship.

To the contrary, Joshua asserts that the contract is not ambiguous and directly addresses the disposition of the pre-embryo. To him, "the requirement of mutual consent is stated in no uncertain terms." In response to Jocelyn's contention that the provision that allows FCM "to refrain from taking any action unless and until otherwise directed" dictates that this Court must balance the parties' interests, he contends that this paragraph "is very clearly intended to protect the storage company, not act as a backdoor for one of the parties to get out of the contract, or to change the clear language of the contract."

The only agreement considered by the circuit court in its memorandum opinion and order was the IVF Contract. On the evening before oral argument, however, Jocelyn's counsel submitted the Storage Agreement, which both parties concede has replaced the IVF Contract. In addition, at the evidentiary hearing, Jocelyn testified to a verbal agreement between her and Joshua about their intentions for any pre-embryos produced through the IVF process, and that testimony was not rebutted or refuted.[21]

We "subscribe to the objective theory of contract interpretation. Under this approach, the primary goal of contract interpretation is to ascertain the intent of the parties in entering the agreement and to interpret 'the contract in a manner consistent with [that] intent.'" *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019) (citations

---

[21] Counsel for Joshua did not argue at oral argument that Joshua had contested the existence of an oral agreement. Instead, counsel appeared to contend that the parties' divorce had altered the enforceability of the oral agreement due to changing circumstances and, alternatively, that subsequent agreements superseded it.

omitted). This inquiry is based on "what a reasonable person in the position of the parties would have understood the language to mean." *Id.* "We will not displace an objective reading of the contract with one party's subjective understanding." *Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436, 456 (2018) (citing *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341 (1999)). To be enforceable, a contract must express "with definiteness and certainty the nature and extent of the parties' obligations and the essential terms of the agreement." *Maslow v. Vanguri*, 168 Md. App. 298, 321-22 (2006) (citations omitted). "In other words, an agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable." *Id.* at 322.

Under the objective theory of contract interpretation, "'a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning.'" *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 418 (2014) (quoting *Calomiris v. Woods*, 353 Md. 425, 436 (1999)). "The determination of whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Id.*

We hold that the IVF Contract does not indicate the parties' preferences in the event of divorce and conclude that the court erred in implying contract terms that do not exist. In contrast to the parties' very specific election under the IVF Contract about what happens to their remaining frozen pre-embryo in the event of death or mental incapacity, the contract is silent in regard to their intentions, as progenitors, in the case of their separation or divorce. *See Szafranski v. Dunston (Szafranski II)*, 34 N.E.3d 1132, 1156 (Ill. App. Ct.

53

2015) (interpreting that "silen[ce] as to what would happen to the couple's pre-embryos if they separated" was "a purposeful omission").

As previously stated, section A.2.c. of the IVF Contract addresses cryopreservation. After clarifying in the first paragraph of this section that the "law regarding freezing and the ownership, control and disposition of frozen embryos is not finally developed," the next paragraph states: "It is the policy of FCM that embryos produced by the joining of eggs and sperm are subject to disposition in a manner *mutually agreed upon by the partners.*"[22] The circuit court interpreted this provision as requiring mutual agreement between Joshua and Jocelyn, "even in the event of divorce." However, the IVF Contract only addresses

---

[22] The IVF Contract also provides, in section A.2.c:

In the event that embryo(s) have been in storage for five (5) years, it is the policy of FCM that the disposition of the frozen embryos should occur at that time. . .. The Couple agrees to make a determination before the expiration of the five (5) years of storage plan.

The Couple understands that FCM will provide them with a thirty (30) days advance notice. . . . **If I/we do not respond or cannot be contacted, FCM is hereby authorized to discard any remaining frozen embryos according to laboratory procedure.**

Therefore, under the IVF Contract the fate of pre-embryos is decided after five years if the parties cannot mutually agree within that time. The Storage Agreement currently governing the situation does not have the same provision authorizing destruction of pre-embryos after five years. It does provide, however, that it may terminate upon the occurrence of various events, including a failure to pay the storage fee or notification by one party that they wish to terminate the Storage Agreement "for any reason or for no reason." If the parties then do not make arrangements for disposition of the frozen pre-embryo in storage upon termination of the Storage Agreement, the pre-embryos will be "deemed 'abandoned' by Clients, and automatically become the sole and exclusive property of Cryobank[.]"

what would happen in the event of divorce when only one of the partners contributed to production of the gametes. Accordingly, the following paragraph applies to the situation at hand:

> I/we (The Couple) understand and agree that if any dispute arises between the two of us regarding disposition of the embryos, FCM is authorized, in its sole discretion, to refrain from taking any action **unless and until otherwise directed by a final judgment of a court of competent jurisdiction or by another agreement signed by both partners**.

(Emphasis added).

Joshua construes FCM's policy as unambiguously providing that the frozen pre-embryo is "subject to disposition in a manner mutually agreed upon by" Joshua and Jocelyn and thereby requires both parties' consent.[23] Clearly, however, rather than reflect the intent of Joshua and Jocelyn, this provision reflects FCM's policy that it will not do anything with the frozen pre-embryo, subject to other provisions in the IVF Contract, without both parties' consent. The IVF Contract was drafted unilaterally by FCM, and there was no testimony of any opportunity by the progenitors to bargain concerning its terms. *See Doyle v. Fin. Am., LLC*, 173 Md. App. 370, 376 n.3 (2007). Indeed, the IVF Contract only allowed the progenitors to make a single selection, among only two choices, in the "event of death or mental incapacity" of one of the progenitors. Given the requirement that a contract must manifest the *progenitors'* intent, we hold that the IVF Contract did not meet this requirement. By requiring the parties to mutually agree when they cannot, the trial

---

[23] As in *Szafranski II*, this provision does not contain any language that contradicts the parties' contemplated use of their frozen pre-embryo under their alleged oral agreement. 34 N.E.3d at 1155.

55

court, in effect, decided in favor of Joshua's recent preference that Jocelyn "doesn't have use" of the frozen pre-embryo.

While we conclude that the IVF Contract does not express the parties' preference concerning disposition of the pre-embryo, Jocelyn presented evidence of an oral agreement between the parties, which Joshua did not dispute. As our framework dictates, the court should consider on remand whether the oral agreement controls the outcome in this case. Jocelyn testified that the parties had discussed "at length beforehand . . . before we went through this procedure, that we agreed that every single embryo would be used because we create a life and it was our responsibility to give that embryo the opportunity of life." Indeed, Joshua testified that the option to donate the pre-embryo would "satisfy our religious take on this situation that life is obviously very valuable."[24]

Because the circuit court also performed a balancing test, we review its analysis to provide further direction on remand.

### III.

### Balancing Test

Jocelyn contends, because the "IVF Contract does not address what happens in the event of a divorce when both parties are the gamete donors," this Court should balance the parties' interests. According to her, because the "evidence sufficiently established that she has no other reasonable means of achieving genetic parenthood other than through IVF,"

---

[24] Even if the court determines that the parties did not enter into an express oral agreement regarding their frozen pre-embryo that would apply in the event of their divorce, certainly both parties testified that their original view was that the "life is obviously very valuable."

56

the court erred and "ignor[ed] case law which directs that if one party would not otherwise be able to achieve genetic parent[hood] by any other reasonable means, the balance must weigh in that parties' favor." In her reply, Jocelyn avers that copies of her certified medical records were "a form of expert testimony plainly demonstrating [Jocelyn's] failed attempts with IUI . . . and sufficiently established that she has no reasonable means of achieving genetic parenthood other than through IVF."

In his opposition, Joshua avers that "the lower court did, in fact, analyze the facts of this case and applied each of the three tests[.]" Specifically, he argues that the court applied the balancing test enunciated in *Rooks* and found that its application "preclude[d] a decision allowing for the implantation of the embryo."

In weighing Joshua and Jocelyn's respective interests in the pre-embryo, we discern error in the court's consideration of some of the *Rooks* factors. The court determined that the parties were "on equal footing regarding the first factor," but does not explain why it determined that this factor was equivalent beyond noting that "[n]either party in this case seeks to donate the embryos." The record reflects that Joshua preferred that the pre-embryo "either be destroyed or potentially donated for use by a needy family with both of us giving away our parental rights to it." The Court in *Rooks* instructed that the first factor analyzes "the intended use of the party seeking to preserve the disputed pre-embryos" because, for example, "[a] party who seeks to become a genetic parent through implantation of the pre-embryos . . . has a weightier interest than one who seeks to donate the pre-embryos to another couple." *In re Marriage of Rooks*, 429 P.3d 579, 593 (Colo. 2018).

In analyzing the second factor, the circuit court determined that Jocelyn had testified that she was "physically capable of repeating the [IVF] process." Overall, it appears that the trial court focused primarily on Jocelyn's supposition that she may still be able to produce eggs as dispositive. Indeed, Jocelyn and her counsel noted that she could go through the procedure again. The relevant inquiry, however, is <u>not</u> whether a progenitor may be "physically capable" to become pregnant through "other means" but whether those "other means"—here, further IVF treatments—are reasonable in the particular circumstances of the case. In analyzing this factor, the circuit court did not mention the physical and emotional toll the IVF process bore on Jocelyn; her age; or the possibility of a successful process. The court must examine these considerations as presented in the record in order to determine whether further IVF is a reasonable alternative.

Regarding the third factor, the circuit court only noted that the parties' reason to pursue IVF "was to have children jointly as a married couple." But again, Jocelyn testified that "before we went through this procedure, [] we agreed that every single embryo would be used because we create a life and it was our responsibility to give that embryo the opportunity of life." Even if the trial court does not find that a mutual oral agreement was reached between the parties, Jocelyn's testimony, assuming the court finds it credible, is directly relevant to the third factor regarding the parties' original reasons for undergoing IVF.

We vacate the judgment of the circuit court and remand the case for the court to consider whether a prior oral agreement resolves the parties dispute and, if necessary, balance the interests of the parties in accordance with the factors and qualifications outlined

58

in this opinion.  We leave the circuit court with remedial flexibility to determine whether

further briefing or evidence would be helpful.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**