

FILED
Jan 26 2024, 8:33 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander N. Moseley
Dixon & Moseley, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Tara K.H. Rabiola
Jaimie L. Cairns
Cairns Rabiola Vance, LLC
Greenwood, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David Freed,

*Appellant-Respondent,*

v.

Elizabeth Freed,

*Appellee-Petitioner.*

January 26, 2024

Court of Appeals Case No.
23A-DC-129

Appeal from the Johnson Circuit
Court

The Honorable Andrew S.
Roesener, Judge

Trial Court Cause No.
41C01-2203-DC-188

**Opinion by Judge Kenworthy**
Judges Foley and Felix concur.

**Kenworthy, Judge.**

## Case Summary

During their marriage, David Freed ("Father") and Elizabeth Freed ("Mother")
underwent *in vitro* fertilization ("IVF") to attempt to have children. They

created and froze pre-embryos,[1] signing an agreement with a cryopreservation company. One of those pre-embryos resulted in the birth of a child.

[2] The couple divorced and resolved all issues except the custody of a single remaining frozen pre-embryo. The issue of how to resolve the custody of a frozen pre-embryo has never appeared before our appellate courts, and the trial court looked to the approaches used by other jurisdictions, balancing the parties' interests and ultimately awarding the pre-embryo to Mother.

[3] Father appeals, raising the issue of whether the trial court's award of the pre-embryo to Mother over Father's objection violates Father's fundamental right of procreation. Determining the trial court applied the appropriate test, we affirm.

## Facts and Procedural History[2]

[4] Mother and Father were married in June 2015. In the early stages of their marriage, Mother and Father discussed raising a family together. They hoped to have two children. When Mother and Father could not get pregnant, they visited a fertility doctor.

---

[1] A human pre-embryo is a human ovum (egg) that has been fertilized by a human sperm and begun cell division. The pre-embryo at issue was frozen at six days old.

[2] We held oral argument on October 26, 2023, at Purdue University. We thank counsel and those in attendance for their attentiveness and respect for the sensitivity of this issue.

Father went through testing first, and his results showed he did not have fertility issues. Mother was tested, and her results revealed she had low ovarian reserve. Her doctor recommended the couple try IVF. Mother took medication to stimulate her ovaries so they would release eggs. The eggs were collected and fertilized with Father's sperm. This first cycle of IVF resulted in one pre-embryo. Mother and Father completed another cycle, which resulted in three pre-embryos.

After completing the IVF cycles, the couple had the first pre-embryo transferred to Mother's uterus in April 2019. The transfer resulted in a pregnancy but ended in a miscarriage. Mother and Father transferred two more pre-embryos in November 2019. "[O]ne of the embryos took and the other did not." *Tr. Vol. 2* at 11. The successful pre-embryo resulted in the birth of a child, G.

The state of Mother and Father's marriage when they conducted the second transfer "was definitely not good." *Id.* "2019 had been a difficult year for [them] with . . . the miscarriage and then other . . . family loss and . . . the discussion of divorce had come up a few months prior to the transfer." *Id.*

Mother filed for dissolution of marriage in March 2022. Mother and Father submitted a partial settlement agreement resolving all issues except disposition of the sole remaining pre-embryo. The trial court accepted the partial settlement agreement and dissolved the parties' marriage.

Mother requested the trial court award her the pre-embryo. She said that if awarded the pre-embryo, she would transfer it to her uterus in hopes it would

result in the birth of a second child. Mother said Father "could either be . . . not involved at all or he could . . . be in a co-parenting relationship like he is with our son, [G.]" if she were to have another child using the pre-embryo. *Id.* Mother earns a salary of $83,000 as a lab supervisor at Roche Diabetes Care, and stated she would be able to financially support herself, G., and another child.

[10] Mother said, "[T]here's very little chance that I could give [G.] a biological . . . sibling ever . . . just based on my previous infertility." *Id.* at 12. She also acknowledged she was four years older than when she underwent her first round of IVF, and—because Mother was forty years old—a future pregnancy "may not even be . . . advised by a doctor." *Id.* Completing another round of IVF would not be a "viable option for [her] to pursue" because she did not have enough coverage left on her insurance. *Id.* Mother acknowledged the chances of success with the pre-embryo transfer: "[A]s I get closer to menopause . . . my cycle could be off and then the [pre-embryo] doesn't necessarily take if the timing is off when they do the implantation." *Id.* at 17. When asked if she believed it was fair "at this point in time to make Mr. Freed a father of a second child if he . . . doesn't want to be," Mother responded "I don't know." *Id.* at 19–20.

[11] Mother concluded by saying:

> These embryos—I already feel like they're my children. At this point, you can already identify whether they're a boy or a girl. We didn't get them tested, so I don't know what the last one is.

> Our first miscarriage was a little girl. And I just think of this embryo already as my child. And I can't fathom, um, destroying it or donating it to science. (Crying). I just want the chance to see if it would result in a . . . child.

*Id.* at 22.

[12] Father requested the trial court award him the pre-embryo so he could ask the storage facility to dispose of it. He did not want to give the pre-embryo to a research facility because he did not "know enough of what would be . . . gained by any study or otherwise, so [he's] not comfortable with that." *Id.* at 27. He did not want to donate the pre-embryo to another couple because he "think[s] mentally [he] would struggle knowing that someone else is raising . . . what is essentially [his and Mother's] child." *Id.* He testified as follows:

> [I]t was hard enough to decide to leave the marriage and separate, um, knowing that I already had a child. . . . [B]ut then the thought of bringing another one in post divorce is not something I think would be a wise decision on either part. . . . [B]ut ultimately, my choice comes down to the fact that I would not be present . . . in that child's life and while there would be some co-parenting, I wouldn't be present overnights or early mornings[;] . . . just at the times where I was able to visit or then have custody on weekends and such . . . with the current situation with [G.], our son, . . . it's hard on a regular basis—a daily basis (crying) to know that I don't get to see him.

*Id.* at 24.

[13] When they began IVF, Mother and Father signed an agreement with the cryopreservation clinic—the facility storing the pre-embryos. In the Advanced

Directives portion of the agreement, Mother and Father indicated that if either of them dies, sole ownership of the pre-embryos would be given to the surviving party. They indicated if they both die, the facility would discard the pre-embryos. The Advanced Directives also provides:

> If the Client Depositors' relationship terminates and the disposition of the embryos is provided for by a divorce decree or other legally-binding document, the Company will comply with that document, upon receipt of a copy. Otherwise, the Company shall dispose of all embryos only as provided herein or in accordance with the Company's Disposition Directive document.

*Ex. Vol. 3* at 7.

[14]     The agreement also contains the Conditions of Release of the pre-embryos, which states:

> A. If the recipient of the embryos is the Client Depositor, the embryos will be released:
>
> > i.     only to a licensed physician (who must execute a consent form provided by the Company), and
> >
> > ii.    upon the express notarized authorization of both Client Depositors, and
> >
> > iii.   upon the authorization of the Recipient's Clinic, and
> >
> > iv.    upon completion of serology/virology tests required by the Company.

*Id.* at 5.

The trial court found the contract offered no directive for the disposition of the pre-embryo if Mother and Father's marriage was dissolved. Because Indiana lacks a statutory scheme or case law on this issue, the trial court looked to other jurisdictions for guidance. In its thorough and well-articulated order, the court found Mother's interest in using the pre-embryo by attempting to implant it and bring a child to term outweighed Father's interest in avoiding parenthood. Father now appeals.

## 1. Assisted Reproductive Technology

Although pre-embryo disposition after the dissolution of a marriage is an issue of first impression in Indiana, we anticipate courts will encounter this issue again. There are eight IVF clinics in Indiana, and seven of those clinics cumulatively reported the births of over 1,000 infants in the year 2021 alone. *Assisted Reproductive Technology (ART) Data*, Centers for Disease Control and Prevention, https://nccd.cdc.gov/drh_art/rdPage.aspx?rdReport=DRH_ART.ClinicsList&SubTopic=&State=IN&Zip=&Distance=50 (last visited January 19, 2024) [https://perma.cc/52S2-WHSY]. And the issue of pre-embryo disposition is not limited to the desires of the genetic contributors—third parties can become involved and complicate the issue. *See* Marla Clark, *Potential Parenthood: The Ownership of Frozen Embryos*, 43 Res Gestae 24, 27 (Nov. 1999) (noting issues of inheritance when genetic contributors die). Establishment of public policy on

this delicate issue would be better left to our General Assembly, but there is currently no legislative guidance.[3]

## 2. Standard of Review

Where—as here—the trial court makes special findings of fact and conclusions of law, we do not set aside the findings or judgment "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). "Findings of fact are clearly erroneous only when they have no factual support in the record[.]"

---

[3] On January 11, 2023, House Bill 1267 was given its first reading and referred to the Committee on Judiciary. No further action has been taken regarding the bill. In relevant part, House Bill 1267 states:

> (a) In the event that two (2) legal owners of cryopreserved embryos are separating or divorcing and do not agree upon the disposition of any cryopreserved embryos, a court of competent jurisdiction shall first look to any existing agreement expressing the couple's intent regarding the disposition of the couple's remaining embryos in the event of divorce or separation. In the absence of an agreement or a dispute concerning the validity of an agreement, the court shall attempt to balance the parties' interests when awarding the embryos.
>
> (b) A court shall consider the following factors when balancing the parties' interests:
>
>   (1) The intended use of the embryos by any party wishing to preserve them.
>
>   (2) A party's reason for wanting to procreate with the cryopreserved embryos.
>
>   (3) The reason for the cryopreservation of the embryos.
>
>   (4) Each party's ability to have genetic children through other means.
>
>   (5) The existence of a party's need to preserve fertility.
>
>   (6) Any burden or hardship that may be placed on a party wishing to avoid procreation.
>
>   (7) Any prior verbal discussions that the party wishing to procreate may have relied upon.
>
>   (8) Any bad faith attempt, by either party, to use the cryopreserved embryos as leverage during a divorce proceeding.
>
>   (9) Any other consideration or occurrence deemed relevant by the court.
>
> (c) A party opposed to the use of a cryopreserved embryo for the purpose of procreation is not considered a legal parent to any child created from the use of a cryopreserved embryo unless the party agrees, in writing, to be a legal parent to the child.

H. 1267, 2023 Reg. Sess. (Ind. 2023), https://billtexts.s3.amazonaws.com/_data/in/https-d37sr56shkhro8-cloudfront-net-pdf-documents-123-2023-house-bills-HB1267-HB1267-01-INTR-pdf.pdf (last visited January 16, 2024) [https://perma.cc/VS7W-49SY].

*Wysocki v. Johnson*, 18 N.E.3d 600, 603 (Ind. 2014). "But the trial court's conclusions of law and any constitutional challenges are reviewed de novo." *In re Adoption I.B.*, 32 N.E.3d 1164, 1169 (Ind. 2015) (internal citations omitted).

### 3. Rights to Procreation and Parenthood

[18] The United States Supreme Court has addressed the right to procreate in several instances. The Court upheld the sterilization of a woman in *Buck v. Bell*, 274 U.S. 200, 207 (1927), but later struck down a statute authorizing the sterilization of certain classes of criminals, *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942). In *Skinner*, the Supreme Court called procreation "one of the basic civil rights of man" and "fundamental to the very existence and survival of the [human] race." 316 U.S. at 541. In *Griswold v. Connecticut*, the United States Supreme Court struck down a statute forbidding married couples' use of contraceptives, describing the marital relationship as "lying within the zone of privacy created by several fundamental constitutional guarantees." 381 U.S. 479, 485 (1965). And in *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972), the Supreme Court said, "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." The Indiana Supreme Court has explicitly recognized a fundamental right to procreation. *See Members of Med. Licensing Bd. of Ind. v. Planned Parenthood Great Nw., Haw., Ala., Ind., Ky., Inc.*, 211 N.E.3d 957, 969 (Ind. 2023); *State v. Alcorn*, 638 N.E.2d 1242, 1245 (Ind. 1994); *State ex rel. Pollard v. Crim. Ct. of Marion Cnty.*, 329 N.E.2d 573, 585 (Ind. 1975).

Under federal substantive due process analysis, the State may not "directly and substantially" interfere with fundamental rights. *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978). If the State's action directly and substantially interferes with a fundamental right, the action is subject to strict scrutiny, meaning the action "must be a necessary means to a compelling governmental purpose and be narrowly tailored to that purpose." *Boultinghouse v. State*, 120 N.E.3d 586, 590 (Ind. Ct. App. 2019) (quoting *Ind. Dep't of Env't. Mgmt. v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 337 (Ind. 1994)), *trans. denied*. "Our Court has held that the 'state and federal substantive due process analys[e]s [are] identical.'" *Id.* (quoting *N.B. v. Sybinski*, 724 N.E.2d 1103, 1112 (Ind. Ct. App. 2000), *trans. denied*).

Pre-embryo disposition cases also implicate parenting rights, which spur additional considerations. Mother argues Father has already consented to procreation by contributing to the creation of the pre-embryos, which reframes Father's procreation rights as parenting rights. *See* Tracey S. Pachman, *Disputes over Frozen Preembryos & the "Right Not to Be a Parent,"* 12 Colum. J. Gender & L. 128 (2003). Parents have a constitutional right to raise their children as they see fit. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972) ("The duty to prepare the child for 'additional obligations,' referred to by the [*Pierce*] Court, must be read to include the

inculcation of moral standards, religious beliefs, and elements of good citizenship."). The Indiana Supreme Court has also outlined the importance of the right to parenthood, stating a "parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests." *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (quoting *Bester v. Lake Cnty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005) (internal quotation marks omitted)).

[21] Some states[4] have adopted a version of Section 706 of the Uniform Parentage Act (2000). Section 706(a) provides:

> If a marriage is dissolved before placement of eggs, sperm, or an embryo, the former spouse is not a parent of the resulting child unless the former spouse consented in a record that if assisted reproduction were to occur after a divorce, the former spouse would be a parent of the child.

Under such statutes, although the former spouse has procreated or consented to procreation, the former spouse may opt out of legal parenthood. *But cf. Straub v. B.M.T. by Todd*, 645 N.E.2d 597, 598 (Ind. 1994) (holding a contract absolving the father of child support was void and unenforceable because it would deprive the child of parental support).[5]

---

[4] These states include Alaska, Colorado, Connecticut, Delaware, Illinois, Maine, New Mexico, North Dakota, Rhode Island, Texas, Utah, Vermont, Washington, and Wyoming.

[5] In its order, the trial court states, "Mother has unequivocally stated that she will require no financial support from [Father], so he is relieved of this burden." *Appellant's App. Vol. 2* at 29. We note Indiana law

[22]     Mother contends Father's right to procreation "is moot given the fact that he already consented to it when providing his sperm to fertilize [Mother's] egg." *Appellee's Br.* at 11. Father argues the trial court's award of the pre-embryo to Mother for implantation strips Father of his right to decide whether to procreate. Father's argument assumes but does not provide legal authority to explain how the trial court's order amounts to state action.

[23]     According to the Fourteenth Amendment to the United States Constitution:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

"Because the Amendment is directed at the States, it can be violated only by conduct that may be fairly characterized as 'state action.'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). To be considered "state action," the conduct causing the deprivation of a federal right must be "fairly attributable to the State." *Id.* at 937. In determining whether the right is fairly attributable to the State, courts conduct a two-step analysis. First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or a person for whom the State is responsible. *Id.*

---

indicates otherwise. *See Schwartz v. Heeter*, 994 N.E.2d 1102, 1107 (Ind. 2013) ("[C]hild support payments are for the benefit of children . . . [and] [m]other could not bargain them away, . . . even at [f]ather's urging."). Neither party raises the issue of child support on appeal.

Second, the party charged with the deprivation must be a person who may fairly be said to be a "state actor." *Id.* Without this second inquiry, "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Id.*

[24] The two inquiries "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Id.* The inquiries "diverge when the constitutional claim is directed against a party without such apparent authority, *i.e.*, against a private party." *Id.* Action by a private party pursuant to a statute, without something more, does not justify a characterization of that party as a "state actor." *Id.* at 939.

[25] Here, the trial court resolved a family law dispute between private parties— indeed, on an issue the parties chose to leave open to judicial determination through their cryopreservation agreement.[6] It is the trial court's role to divide property and determine child custody when dissolving marriages. *See* Ind. Code §§ 31-15-7-5 & 31-30-1-12.[7] In this role, the trial court *must* balance parties' competing fundamental rights. The trial court here merely provided a

---

[6] We urge parties signing cryopreservation agreements to carefully consider the consequences of such agreements should they later separate.

[7] Trial courts also determine child custody for unmarried parents, I.C. § 31-14-10-1, and provide relief in property disputes when unmarried couples separate, *Neibert v. Perdomo*, 54 N.E.3d 1046, 1051–52 (Ind. Ct. App. 2016).

neutral forum to resolve a private dispute. This is insufficient state action to implicate Fourteenth Amendment protections. The disposition of a pre-embryo—which we will categorize below as being *between* a person and property—may therefore properly be determined by the trial court.

## 4. Pre-Embryos Are Entitled to Special Respect

[26] The ways courts have classified pre-embryos—as property, persons, or an interim category—impacts the outcome of pre-embryo disposition cases. Jurisdictions that find pre-embryos are personal property can treat the pre-embryos as any other marital property and apply their states' property division regimes. *See In re Marriage of Dahl and Angle*, 194 P.3d 834, 841 (Or. Ct. App. 2008) ("[In the context of pre-embryo dispositions,] we review *de novo* the trial court's division of marital property, [and] we review the award itself for the proper exercise of discretion."); *Kotkowski-Paul v. Paul*, 204 N.E.3d 66, 76 (Ohio Ct. App. 2022) ("[T]he trial court did not err in concluding the subject embryos are marital property subject to allocation as part of the division of such property.").

[27] Louisiana classifies an "in vitro fertilized human ovum" as "a biological human being which is not the property of the physician which acts as an agent of fertilization, or the facility which employs him or the donors of the sperm and ovum." La. Stat. Ann. § 9:126 (1986). "A court in the parish where the in vitro fertilized ovum is located may appoint a curator upon motion of the in vitro

fertilization patients, their heirs, or physicians who caused in vitro fertilization to be performed, to protect the in vitro fertilized human ovum's rights." *Id.*

[28] Most courts that have addressed this issue, following the approach taken by the Tennessee Supreme Court in *Davis v. Davis*, find pre-embryos "occupy an interim category that entitles them to special respect because of their potential for human life." 842 S.W.2d 588, 597 (Tenn. 1992), *cert. denied*. Under this rationale, pre-embryos cannot be valued and divided as other marital property.

[29] Here, neither party argues the trial court erred in classifying the pre-embryo as deserving "special respect." But Father argues the trial court erred in finding the embryos deserved special respect to the extent it did so because of the State's interest in them, which Father claims is not supported by outside jurisdictions. At oral argument, Father's counsel drew this Court's attention to Indiana Code Section 16-34-1-0.5, which explicitly excludes IVF from Indiana's statute prohibiting abortion.

[30] The United States Supreme Court has afforded recognition and some State protection to human embryos at the earliest stages of development. *In vitro* pre-embryos and *in utero* pre-embryos share a potential for human life that sets them apart from property. We agree with the trial court that *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992)—though overruled by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 215 (2022)—continue to offer helpful discussions about how the law views nascent human life. The *Roe* court acknowledged the State has an "important

and legitimate interest in protecting the potentiality of human life." *Roe*, 410 U.S. at 162. The *Casey* court decided "the State may take measures to ensure that the woman's choice is informed" in order to "promote the State's profound interest in potential life, throughout pregnancy[.]" *Casey*, 505 U.S. at 878.

[31] Indiana law supports the trial court's determination that pre-embryos deserve special respect. The Indiana Supreme Court has found "our laws have long reflected that Hoosiers, through their elected representatives, may collectively conclude that legal protections inherent in personhood commence before birth, so the State's broad authority to protect the public's health, welfare, and safety extends to protecting prenatal life." *Members of Med. Licensing Bd. of Ind.*, 211 N.E.3d at 961. And Indiana Code Section 16-34-2-1.1 requires a woman seeking a legal abortion to sign a consent form acknowledging "human physical life begins when a human ovum is fertilized by a human sperm." But that definition of human life "does not apply to in vitro fertilization." I.C. § 16-34-1-0.5. Therefore, although Indiana law attributes "human physical life" to fertilized eggs *in utero*, it sets pre-embryos *in vitro* apart. As such, we cannot say *in vitro* frozen pre-embryos are entitled to personhood under Indiana law. [8]

[32] Thus, pre-embryos, as neither property nor persons, are in a separate category that entitles them to special respect. Father and Mother do not have a true

---

[8] We discuss abortion caselaw and statutes in this section only to the extent they illustrate courts' understandings of prenatal existence. As is apparent from Indiana Code Section 16-34-1-0.5, Indiana law treats pregnancy and abortion, which occur *in utero*, differently from IVF, which occurs *in vitro—ex utero*.

property interest in the pre-embryos, but "they do have an interest in the nature of ownership, to the extent they have decision-making authority concerning disposition of the preembryos, within the scope of policy set by law." *Davis*, 842 S.W.2d at 597.

## 5. Other Jurisdictions' Approaches to Pre-Embryo Disposition

[33] Generally, states have taken three approaches in pre-embryo disposition cases: the contract approach, the balancing test approach, and the contemporaneous mutual consent approach. In practice, courts do not strictly adhere to just one of these approaches, generally applying some combination.

[34] The contract approach is the preferred method of deciding pre-embryo disposition cases, but in many cases, courts find nothing in the contract revealing the parties' preference for pre-embryo disposition in the case of separation or dissolution. When contracts do not contain such a provision, most states adopt the balancing approach, weighing the parties' interests against each other. This weighing usually involves one party's interest in using the pre-embryo to attempt to bring a child to term and one party's interest in avoiding procreation by discarding the pre-embryos or leaving the pre-embryos frozen. Finally, a few states have adopted the contemporaneous mutual consent approach, which maintains the status quo indefinitely (leaving the pre-embryos frozen) until the parties agree on the disposition of the pre-embryos.

### 5.1 The Contract Approach

[35] Appellate courts in other jurisdictions generally attempt to honor the agreement between the couple and the pre-embryo storage facility. Most of these courts prescribe the contract approach first and explain that only after determining there is not an applicable agreement should courts move on to another approach. By enforcing the terms of the parties' agreement with the cryopreservation clinic, courts can ensure predictability and honor the original intent of the parties. *See Szafranski v. Dunston*, 993 N.E.2d 502 (Ill. App. Ct. 2013).

[36] Courts following the contract approach treat the contract for the disposition of the pre-embryos no differently than other contracts, leaving open the same defenses and interpretation regimes. *See, e.g.*, *Bilbao v. Goodwin*, 217 A.3d 977, 980 (Conn. 2019) (holding the checkbox nature of the cryopreservation agreement did not render it insufficient); *see also McQueen v. Gadberry*, 507 S.W.3d 127, 156 (Mo. Ct. App. 2016) (holding the party seeking to enforce a cryopreservation directive did not prove by clear and convincing evidence the directive was a valid and enforceable agreement between the parties). Indeed, such courts have reasoned "[t]he subject of this dispute may be novel but the common-law principles governing contract interpretation are not." *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998).

[37] But the Supreme Judicial Court of Massachusetts, like other critics of the contract approach, noted the approach does not leave room for one or both parties' change of heart. *A.Z. v. B.Z.*, 725 N.E.2d 1051, 1059 (Mass. 2000)

("[P]rior agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions.").

### 5.2 The Balancing Approach

[38] Most jurisdictions, if they cannot resolve the issue by enforcing the cryopreservation agreement, follow the balancing approach taken in *Davis*. There, the Tennessee Supreme Court stated:

> [D]isputes involving the disposition of preembryos produced by in vitro fertilization should be resolved, first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed. Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question. If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered. However, if the party seeking control of the preembryos intends merely to donate them to another couple, the objecting party obviously has the greater interest and should prevail.

842 S.W.2d 588 at 604.

[39] Courts following the approach in *Davis* have outlined several considerations for trial courts balancing the parties' interests:

(1) the intended use of the frozen pre-embryos by the party seeking to preserve them; (2) the reasonable ability of a party seeking implantation to have children through other means; (3) the parties' original reasons for undergoing IVF, which may favor preservation over disposition; (4) the potential burden on the party seeking to avoid becoming a genetic parent; (5) either party's bad faith and attempt to use the frozen pre-embryo as leverage in the divorce proceeding; and (6) other considerations relevant to the parties' unique situation.

*Jocelyn P. v. Joshua P.*, 250 A.3d 373, 380 (Md. Ct. Spec. App. 2021); *see also In re Marriage of Rooks*, 429 P.3d 579, 593 (Colo. 2018), *cert. denied*.

[40] Father, like other critics of the balancing test approach, claims the approach puts the court in the position to make reproductive decisions for the parties— thereby inevitably violating one of the parties' right to procreation. And courts' determinations under the balancing test are fact-specific, leading to less predictable results for the parties.

### 5.3 The Contemporaneous Consent Approach

[41] A few courts have adopted the contemporaneous mutual consent approach— the approach Father suggests we take. Under this approach, neither party may determine pre-embryo disposition without the present consent of the other party. As discussed earlier, the Supreme Judicial Court of Massachusetts adopted the contemporaneous consent approach, finding the agreement at issue was "not a separation agreement that is binding on the couple in a divorce proceeding pursuant to [Massachusetts' alimony statute]." *A.Z.*, 725 N.E.2d at 1057. The court said its "Legislature has already determined by statute that

individuals should not be bound by certain agreements binding them to enter or not enter into familial relationships." *Id.* at 1158.

[42] The Iowa Supreme Court has determined cryopreservation agreements are not enforceable when one of the parties later changes his or her mind. *In re Marriage of Witten*, 672 N.W.2d 768, 777 (Iowa 2003). The *Witten* court reasoned "it may be impossible to make a knowing and intelligent decision to relinquish a right in advance of the time the right is to be exercised." *Id.* (internal quotation omitted). The *Witten* court also noted the contemporaneous consent approach adheres to Iowa law by allowing the parties "to make family and reproductive decisions based on their current views and values" with an "awareness that such decisions are highly emotional in nature and subject to a later change of heart." *Id.* at 782.

[43] The *Davis* court explicitly decided against the contemporaneous consent approach in part because when the case was decided in 1992, frozen pre-embryos could only survive for two years. The *Davis* court determined applying the contemporaneous consent approach would grant the party seeking to avoid procreation "the inherent power to veto any transfer of the preembryos . . . and thus to insure their eventual discard or self-destruction." *Davis*, 842 S.W.2d at 598.

[44] Although cryopreservation clinics can now store pre-embryos indefinitely, the concern about granting one party a de facto veto persists. In *Jocelyn P.*, the Maryland Court of Special Appeals criticized the contemporaneous consent

approach as creating a de facto veto over the party seeking to use the pre-embryo by avoiding any resolution until the issue is mooted and as a way to punish soon-to-be ex-spouses. 250 A.3d at 397. The Pennsylvania Superior Court called the approach "totally unrealistic" because if the parties could come to an agreement, they would not be before the court. *Reber v. Reiss*, 42 A.3d 1131, 1135 n.5 (Pa. Super. Ct. 2012).

### 5.4 Deference to Trial Court

Some appellate courts, rather than explicitly adopt one of the three approaches, defer to the decision of the trial court. *See Reber*, 42 A.3d at 1136 (determining without explicitly adopting a test that the balancing approach used by the trial court was the most suitable); *see also McQueen*, 507 S.W.3d at 157 ("Multiple decisions from our Court indicate that [the statute governing the division of marital property] does not prohibit courts from awarding property to parties jointly in unusual circumstances where the property cannot be justly divided.").

## 6. Application

### 6.1 The cryopreservation agreement is inconclusive about the disposition of the pre-embryo

We agree with the courts that first look for an enforceable agreement regarding the disposition of the pre-embryos in the event of divorce. This approach allows trial courts to attempt to honor both parties' interests and rights regarding procreation: "[B]inding agreements 'minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority

to make what is in the first instance a quintessentially personal, private decision.'" *Rooks*, 429 P.3d at 592 (quoting *Kass*, 696 N.E.2d at 180).

[47] Mother and Father do not challenge the trial court's finding that the contract does not contain a directive on the disposition of the pre-embryo if Mother and Father's marriage dissolves. And we agree with the trial court's conclusion that Mother and Father offered no directive in the cryopreservation contract regarding the disposition of the pre-embryo upon the dissolution of the parties' marriage. Thus, we must resolve this dispute some other way.

### 6.2  We reject the contemporaneous consent approach

[48] Father proposes we adopt the contemporaneous consent approach, which "ensures that each of the Parties' respective constitutional right to procreate, or not to procreate, is protected from government intrusion." *Appellant's Br.* at 21. But the facts of this case underscore the inequities of the contemporaneous consent model. Father's participation in the IVF process indicates he decided to exercise his positive right to procreate in 2018. Mother and Father underwent IVF because Mother had low ovarian reserve. They both hoped for two children—two full biological siblings. Two rounds of IVF resulted in only four eggs. Rather than choosing to preserve Mother's unfertilized eggs after retrieval, the parties decided to use Father's sperm to fertilize *all* of them. Transfer of the first pre-embryo resulted in miscarriage. Then, at a time when their marriage "was definitely not good" and after they had discussed divorce, Mother and Father underwent a second transfer of two pre-embryos. One child, G., was born and one pre-embryo remains. The parties' cryopreservation

contract provides no advanced directive for disposition of this pre-embryo in the event the parties' relationship ends. Now, after Mother has relied on Father's consistent participation over a course of years, Father seeks to withdraw from the process and prevent Mother's use of the pre-embryo, leaving Mother with little—if any—chance to conceive and give birth to another biological child. Meanwhile, Father remains physically able to procreate.

[49] We must agree with courts that have found the contemporaneous consent approach "totally unrealistic." *Reber*, 42 A.3d at 1135 n.5. If parties could agree on their own about the disposition of the pre-embryo upon divorce, they would have no need of the court's intervention. Jurisdictions following this approach ignore any preexisting agreement between the parties if one or both parties has a change of heart. This creates legal uncertainty and eliminates any reason for parties to form an agreement regarding the disposition of pre-embryos upon divorce.

[50] Contrary to honoring *both* parties' interests and procreation rights, the contemporaneous consent approach promotes a clear winner: the party seeking to avoid procreation. The party seeking to avoid procreation may simply never agree to the use of the pre-embryos, which would remain frozen indefinitely. Such a solution would provide the party avoiding procreation with a de facto veto and an incentive to leverage this issue in bad faith.

[51] The contemporaneous consent approach would require trial courts to abandon their role in dissolution proceedings for the issue of pre-embryo disposition.

Indiana Code Section 31-15-7-4(b) instructs courts to divide marital property "in a just and reasonable manner." And the trial court has broad discretion both in "ascertaining the value of property in a dissolution action," *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996), and in determining equitable division of the property, *In re Marriage of Perez*, 7 N.E.3d 1009, 1010–12 (Ind. Ct. App. 2014); I.C. § 31-15-7-5 ("The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence . . . that an equal division would not be just and reasonable[.]") Indiana Code Section 31-30-1-12 describes the trial court's jurisdiction to determine child custody in marriage dissolutions.[9] Pre-embryos are not common marital property nor are they children; they exist in an interim category between the two. This interim category is logically included in family law cases, so "[w]e cannot simply do nothing." *Rooks*, 429 P.3d at 592.

### 6.3 We adopt the balancing approach

[52] If the contract approach does not resolve the parties' dispute, the trial court should then seek to balance the parties' interests. The balancing approach reflects Indiana trial courts' role in dissolution proceedings: Mother and Father have an interest in disposition of the pre-embryo after their divorce, and the trial

---

[9] Trial courts also resolve issues of child custody and property division for unmarried parties. *See supra* n.7.

court must weigh their interests and award the pre-embryo "in a just and reasonable manner." I.C. § 31-15-7-4(b).

[53] Because pre-embryos are entitled to special respect, certain factors must be considered when balancing the parties' interests. We agree with the factors as listed in *Jocelyn P.* and *Rooks* and state them as: (1) the intended use of the pre-embryos by the party seeking to preserve them; (2) the reasonable ability of the party seeking implantation to have children through other means; (3) the parties' original reasons for undergoing IVF, which may favor preservation over disposition; (4) the potential burden on the party seeking to avoid becoming a genetic parent; (5) either party's bad faith attempt to use the pre-embryos as leverage in the dissolution proceeding; and (6) other considerations relevant to the parties' unique situation.

[54] When weighing the parties' interests, trial courts should *not* consider "whether the party seeking to become a genetic parent using the pre-embryos can afford another child." *Rooks*, 429 P.3d at 594. And "the sheer number of a party's existing children, standing alone," is not "a reason to preclude preservation or use of the pre-embryos." *Id.* Finally, because genetic and gestational parenthood are distinct from parenthood through adoption, "courts should not consider whether a spouse seeking to use the pre-embryos to become a genetic parent could instead adopt a child or otherwise parent non-biological children." *Id.*

[55] There is language within *Davis* that, though judicious for the facts therein, might stifle other trial courts' abilities to fairly balance the parties' interests. The *Davis* court determined although "women contribute more to the IVF process than men," "[t]heir experience . . . must be viewed in light of the joys of parenthood that is desired or the relative anguish of a lifetime of unwanted parenthood." 842 S.W.2d at 601. And the statement that "[o]rdinarily, the party wishing to avoid procreation should prevail" creates a rebuttable presumption against the party seeking to use the pre-embryo to procreate. *Id.* at 604; *see* Benjamin C. Carpenter, *Sperm is Still Cheap: Reconsidering the Law's Male-centric Approach to Embryo Disputes After Thirty Years of Jurisprudence*, 34 Yale J.L. & Feminism 1, 3–4 (2023).

[56] These comparisons and presumptions proceed from the facts of *Davis*. There, the husband's troubled and fatherless upbringing made him particularly sensitive to the prospect of creating a child he would be unable to raise. Even though the wife sought to donate the pre-embryos, the husband was worried the couple receiving the pre-embryos might give birth to a child and eventually divorce, leaving the child to suffer an upbringing like the husband's. We decline to adopt a presumption in favor of either party.

[57] Here, the trial court identified factors identical to those we have adopted and determined a consideration of the factors favors Mother. The trial court explained:

> 83. Mother does not request that the embryo be awarded to
> another female or couple for uterine implantation nor does she

seek to have the embryo donated for purposes of scientific research. She plainly seeks to have the embryo implanted in her uterus with the hope of producing a biological child. Her medical condition, the existence of which is unchallenged by Father, operates as a substantial impediment to natural conception, as does her advancing age. There is no evidence of bad faith by either party. The original reason for in vitro fertilization is consistent with the very purpose for which Mother seeks to use the embryo . . . to beget a biological sibling for [G.]. Finally, Mother's insurance will cover the cost of this final uterine implantation. Thereafter, the significant costs of any future in vitro fertilization will be borne by Mother without recompense by her health insurer.

84. As it relates to Father, Mother has unequivocally stated that she will require no financial support from him, so he is relieved of this burden. There is, however, another burden . . . and a significant one . . . placed upon Father by way of Mother's request. That burden comes in the form of an emotional weight he is forced to carry by being compelled to [f]ather a child he will not raise in the context of an intact, nuclear family. It was clear to this court that Father's desire to avoid this very heartache was the principal basis for his request that the embryo be destroyed. This factor weighs heavily in favor of Father, but, in this court's estimation, does not overcome the other factors which tilt in Mother's favor.

*Appellant's App. Vol. 2* at 28–29.[10]

---

[10] After weighing Mother's and Father's interests under the factors enunciated in *Jocelyn P.* and *Rooks*, the trial court proposes the consideration of "how the parties' competing requests impact the pre-embryo," which the trial court frames as "the termination of the pre-embryo" versus "the possibility of viability and life." *Id.* at 30–31. But this factor creates a presumption for the party seeking implantation, and we do not adopt it here.

[58] Father appeals the trial court's use of the balancing test, not the trial court's balancing of the factors in favor of Mother. And although we disagree with the trial court's statement that Father is relieved of the potential burden of child support, the error is harmless. Father's testimony focused on the emotional—not financial—burden of raising a child outside of marriage. He explained his preference for discarding the pre-embryo arises from "the fact that [he] would not be present . . . in that child's life" because he and Mother would be divorced. *Tr. Vol. 2* at 24. Father described how it was already difficult for him to raise G. in that context. Father did not provide evidence of—and the trial court placed little emphasis on—any financial burden an additional child would place on Father. Further, the pre-embryo has not resulted in the birth of a child, and any questions regarding support are hypothetical. The parties are litigating the disposition of the pre-embryo, not *potential* support of a *potential* child. That issue would require a separate hearing when the issue is squarely before the court.

[59] At bottom, the trial court applied the appropriate test, balancing the parties' interests using the appropriate factors.

## Conclusion

[60] On the issue of pre-embryo disposition, trial courts should first look to any existing agreement between the parties to determine whether the parties memorialized their intentions for the pre-embryos upon their separation or divorce. If there is no applicable provision, the trial court's role and discretion in dividing marital property and determining child custody leads us to conclude

that balancing the parties' interests is the most appropriate way to address pre-embryo disposition upon divorce. But because pre-embryos are entitled to special respect, factors beyond those outlined in Indiana Code Chapter 31-15-7 must be considered. These additional factors include: (1) the intended use of the pre-embryos by the party seeking to preserve them; (2) the reasonable ability of the party seeking implantation to have children through other means; (3) the parties' original reasons for undergoing IVF, which may favor preservation over disposition; (4) the potential burden on the party seeking to avoid becoming a genetic parent; (5) either party's bad faith attempt to use the pre-embryos as leverage in the dissolution proceeding; and (6) other considerations relevant to the parties' unique situation.

[61] Here, the trial court applied the appropriate test and considered the appropriate factors. Accordingly, we affirm.

[62] Affirmed.

Foley, J., and Felix, J., concur.